# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF KENTUCKY
### FRANKFORT DIVISION

| | |
|---|---|
| SAMANTHA WIGGINTON, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>COMMONWEALTH OF KENTUCKY, et al.,<br><br>Defendants. | Civil Action No. 3:26-cv-00035-CHB<br><br>**PLAINTIFFS' RESPONSE IN OPPOSITION TO COMMONWEALTH OF KENTUCKY, ATTORNEY GENERAL RUSSELL COLEMAN, COUNCIL ON POSTSECONDARY EDUCATION, DR. AARON THOMPSON, AND MADISON SILVERT'S MOTION TO DISMISS** |

## INTRODUCTION

The Commonwealth's Motion confirms why this case cannot be dismissed at the pleading stage. The moving Defendants are not peripheral actors. The Commonwealth of Kentucky [hereinafter "Commonwealth" or "Kentucky"] is the recipient of federal financial assistance and the sovereign whose public higher-education system is challenged. The Council on Postsecondary Education [hereinafter "CPE"], is the Commonwealth agency that Senate Bill 185 [hereinafter "SB 185"] charges with extraordinary fiscal oversight, expenditure approval, academic-program review, admissions authority, debt reporting, and approval or amendment of KSU's program-closure plan. Dr. Aaron Thompson and Madison Silvert are sued in their official capacities because they lead CPE, the entity that now sits at the center of the challenged implementation structure. The Attorney General is sued in his official capacity for prospective relief relating to statewide implementation and compliance with federal law.

The Motion attempts to recast Plaintiffs' Complaint as a generalized objection to legislation affecting KSU. That is not the Complaint. Plaintiffs allege their own educational, reliance, reputational, accreditation, degree-value, programmatic, and equal-opportunity injuries

arising from Kentucky's post-notice refusal to remedy federally identified KSU underfunding and from SB 185's KSU-only emergency restructuring of Kentucky's only public HBCU and 1890 land-grant institution. The Complaint asks the Court to prevent Kentucky from using the same institutional weakness created by generations of underfunding and still unresolved Title VI/Fordice obligations as the justification for narrowing KSU's mission, programs, faculty, admissions, fiscal autonomy, and land-grant capacity before Kentucky has made KSU whole.

The Motion should be denied for five independent reasons. First, Plaintiffs assert their own injuries; they do not rely on third-party standing for KSU. Second, the pleaded injuries are concrete and imminent, and the post-Complaint implementation facts cited by Defendants confirm, rather than defeat, imminence. Third, CPE's direct statutory powers under SB 185 make traceability and redressability obvious as to CPE, Thompson, and Silvert, while Title VI and 42 U.S.C. §2000d-7 permit suit against the Commonwealth as a federal-funding recipient. Fourth, the Complaint states plausible Title VI, Equal Protection, *Fordice, Arlington Heights*, land-grant-related declaratory/equitable, and due-process theories. Fifth, dismissal with prejudice would be improper even if the Court required more particular pleading as to any official or theory. Defendants' background narrative does not alter the Rule 12 posture. Bipartisan passage, statements that legislators hoped to help KSU, earlier loans or oversight legislation, and SACSCOC probation may be part of Defendants' eventual factual defense, **but they do not defeat the Complaint's well-pleaded theory**. The question is not whether some officials professed good intentions. The question is whether Plaintiffs plausibly allege that Kentucky, after formal federal notice of KSU underfunding and decades of Title VI/*Fordice* remedial commitments, imposed KSU-only restrictions that aggravate those federal violations. They do, and the Motion to Dismiss should, therefore, be summarily Overruled.

# <u>LEGAL STANDARD</u>

Defendants invoke Rules 12(b)(1) and 12(b)(6). To the extent they mount a facial standing attack, the Court accepts the Complaint's material allegations as true and construes them in Plaintiffs' favor. *Gentek Bldg. Prods., Inc. v. Sherwin-Williams Co.*, 491 F.3d 320, 330 (6th Cir. 2007); *Cartwright v. Garner*, 751 F.3d 752, 759-60 (6th Cir. 2014). At the pleading stage, "general factual allegations of injury resulting from the defendant's conduct may suffice," because courts presume that general allegations include the facts necessary to support the claim. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).

Standing requires injury, in fact, traceability, and redressability. *Id.* at 560-61. Traceability is not a proximate cause, and a defendant need not be the sole cause or last implementing actor. *Bennett v. Spear*, 520 U.S. 154, 168-69 (1997); *Parsons v. U.S. Dep't of Justice*, 801 F.3d 701, 713-15 (6th Cir. 2015). Redressability requires likely relief from a favorable order; it does not require that one order eliminate every injury. *Larson v. Valente*, 456 U.S. 228, 243 n.15 (1982); *Parsons,* 801 F.3d at 715.

Under Rule 12(b)(6), the Court accepts well-pleaded facts as true, draws reasonable inferences for Plaintiffs, and asks whether the Complaint plausibly states entitlement to relief. *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009); *Handy-Clay v. City of Memphis*, 695 F.3d 531, 538 (6th Cir. 2012). A motion to dismiss is not the place to weigh legislative motives, decide whether Defendants' preferred explanation is more persuasive, resolve competing inferences from historical evidence, or determine the adequacy of future teach-outs and accreditation approvals on an undeveloped record. Finally, as to official-capacity claims, the relevant question is not whether the official is personally liable, but whether the official has a sufficient connection to the challenged ongoing violation and the requested prospective remedy. *Ex parte Young*, 209 U.S. 123, 157 (1908); *Verizon Md. Inc. v. Pub. Serv. Comm'n,* 535 U.S. 635 (2002).

## RELEVANT ALLEGATIONS AND JUDICIALLY NOTICEABLE LAW

For purposes of the Commonwealth Defendants' facial Rule 12 motion, the well-pleaded allegations of the Complaint must be accepted as true, including, *inter alia*: Kentucky's public higher-education system was formally identified by the Office for Civil Rights in 1981 as racially segregated in violation of Title VI. As a direct result, Kentucky established successive statewide desegregation plans treating KSU enhancement as a remedial obligation to the federal government as a result of the ongoing discrimination. In 2009, a Final Report confirmed that Kentucky's remedial framework obligated it to maintain KSU's "'unique mission as the Commonwealth's small, liberal arts university.'" *Compl*. ¶¶5-11, 66-114, 249-54.

The September 18, 2023, USDA/USDOE notice informed Kentucky that KSU, Kentucky's 1890 land-grant institution, had not advanced on par with the University of Kentucky, the 1862 land-grant institution, in large part because of unbalanced funding. *Compl*. ¶¶12-16, 116-22. It identified at least $172,135,168 that should have been available to KSU, explained that those funds could have supported infrastructure, student services, and research competitiveness, and urged Kentucky to develop a plan to make KSU whole through a substantial state allocation and a future-oriented budget commitment. *Id*. ¶¶119-22. The notice also made clear that remediation did not require reducing funding to other institutions or reducing KSU's general-fund allocations. *Id*. ¶122.

The Commonwealth did not make KSU whole, adopt a durable parity plan, or implement no-offset protections. *Id*. ¶¶125-28. Instead, the Commonwealth adopted SB 185, which declares a five-year financial exigency at KSU, requires CPE approval for KSU obligations or expenditures of $20,000 or more, requires monthly financial reporting to CPE, gives CPE ongoing financial monitoring, requires CPE to approve or amend program-review submissions, caps KSU at no more than ten academic areas of study, authorizes termination of employees

including tenured employees under certain circumstances, imposes admissions and debt-enrollment restrictions, and changes KSU's statutory mission. SB 185; *Compl.* ¶¶ 129-45.

CPE is not a bystander. Kentucky law authorizes CPE to coordinate and oversee public postsecondary education, approve or revise institutional missions, serve as a state agency for federal higher-education planning functions, approve admissions qualifications, and exercise discretion in fund-allocation policies and budget recommendations. KRS §164.020. SB 185 then gives CPE special KSU-only expenditure-approval, financial-oversight, program-review, admissions, debt-reporting, and implementation responsibilities. *Compl.* ¶¶43, 47-48, 129-45. Those alleged and statutory functions directly connect the Commonwealth Defendants to the challenged injuries and requested relief sought from the Commonwealth.

The Complaint pleads individualized injuries to current students, prospective and admitted students, alumni, and the KSU community, including program restrictions and closures, altered degree pathways, loss of faculty mentors, accreditation consequences, reduced program choice, admissions and debt-enrollment restrictions, impaired degree value, diminished recruitment, and narrowing of KSU's HBCU and land-grant mission. *Compl.* ¶¶ 146-80, 181-289. At this stage, those allegations are accepted as true.

Defendants' own public materials confirm the immediacy of implementation. KSU has publicly stated that its Board approved an academic plan required by SB 185, delivered it to CPE, and moved KSU into the next phase of a five-year transition toward a polytechnic focus. Those facts do not negate standing; they confirm that program review, mission transition, and CPE implementation are underway.

<u>**ARGUMENT**</u>

**I.    PLAINTIFFS HAVE ARTICLE III STANDING.**

**A.  *Plaintiffs assert their own injuries; they do not seek to litigate only KSU's rights.***

Defendants' third-party-standing argument misidentifies the right asserted. Plaintiffs do not sue merely because they "prefer" a different funding policy for KSU. They sue because, as admitted or prospective students and alumni of Kentucky's only public HBCU, they are the persons who receive the educational services, academic programs, faculty support, accreditation value, alumni-network value, admissions opportunities, and land-grant/HBCU benefits intentionally diminished by the challenged state action. Title VI protects "no person" from discrimination under federally funded programs. 42 U.S.C. §2000d. The "program or activity" definition includes **all operations of a public college or university and a public system of higher education receiving federal financial assistance**. 42 U.S.C. § 2000d-4a(2)(A).

That is precisely why HBCU students have been permitted to litigate desegregation and Title VI/*Fordice* claims. In *Coalition for Equity & Excellence in Maryland Higher Education, Inc. v. Maryland Higher Education Commission*, 977 F. Supp. 2d 507, 519-20 (D. Md. 2013), the court held that current students at Maryland's public HBCUs had standing to challenge current policies traceable to the *de jure* higher-education system. *Denton v. Bd. of Gov. for the State University System of Florida*, 713 F. Supp. 3d 1207, 1212-13 (N.D. Fla. 2024), likewise rejected the threshold argument that FAMU students lacked standing where they alleged that their own educations were adversely affected by discrimination against Florida's only public HBCU.[1]

Defendants therefore cannot defeat standing by saying "Plaintiffs are not KSU." A student need not be the university to suffer equal-educational-opportunity injury. When government imposes a barrier that makes access to a benefit more difficult, the equal-treatment

---

[1] *Denton* ultimately dismissed the complaint under Rule 12(u)(6) on Florida-specific pleading grounds, but its standing analysis is directly applicable herein and should be properly applied as such.

injury is the denial of an opportunity to compete on equal footing, not proof that the plaintiff would have obtained the ultimate benefit in a counterfactual world. Northeastern Fla. Chapter of Associated Gen. Contractors v. City of Jacksonville, 508 U.S. 656, 666 (1993). Here, Plaintiffs allege more than unequal competition: they allege that ongoing state action directly reduces the educational program, institutional mission, faculty base, accreditation security, and land-grant/HBCU capacity of the institution from which they receive or received educational benefits.

### B. Plaintiffs allege concrete and imminent injuries, not abstract uncertainty.

The Motion repeatedly characterizes Plaintiffs' injuries as "uncertainty." The Complaint alleges far more. Current students allege exposure to program closures, program caps, altered degree pathways, loss of faculty mentors, accreditation risk, mission change, admissions and debt restrictions, and changes in the academic climate and institutional value of the KSU degree. *Compl*. ¶¶181-225. Prospective and admitted students allege immediate reliance and enrollment injuries. *Id.* ¶¶258-89. Alumni allege ongoing injury to degree value, institutional reputation, alumni-network value, recruitment, and the HBCU/land-grant identity attached to their credentials. *Id*. ¶¶226-57.

At the pleading stage, these allegations suffice. Standing is assessed claim by claim and remedy by remedy, but one plaintiff with standing is enough to permit adjudication of a claim for prospective relief. *Parsons*, 801 F.3d at 710. The current student Plaintiffs alone satisfy that requirement. They are enrolled in the affected institution, subject to SB 185's mission, program, financial, admissions, debt, and accreditation implementation, and face ongoing educational consequences from the statute and the post-notice refusal to remediate KSU's underfunding.

Defendants' post-Complaint reliance on KSU's May 2026 academic-plan process does not defeat standing. **Standing is ordinarily evaluated as of the commencement of suit**. *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc*., 528 U.S. 167, 180 (2000). In any event, the cited implementation facts confirm that SB 185 is not speculative. KSU's Board has

already approved an academic plan, and submitted the same to CPE for approval, advancing the first, of numerous steps, in a five-year transition toward a polytechnic focus, and program actions continue through the CPE process.[2] Those developments confirm the immediacy of program review, program changes, CPE approval, and mission transition; they do not prove that no student, admitted student, prospective student, alumnus, or class member is injured.

Nor does Defendants' assertion that no named student currently majors in a slated-for-closure program end the case. Plaintiffs challenge campuswide and systemwide injuries: mission restructuring, program caps, loss of academic breadth, faculty and advisor instability, accreditation risk, financial-exigency controls, admissions restrictions, debt-enrollment restrictions, and degree-value harm **<u>over the course of the next five (5) years</u>**. A student at a public HBCU need not wait until his or her own major is formally eliminated in order to challenge a state policy that allegedly diminishes the federally protected educational program in which the student participates – especially when such a structure is intended to take place over the course of the next five (5) years. In addition, the Complaint pleads putative classes and subclasses that include affected students and applicants; class issues should be addressed under Rule 23, not through premature factual narrowing on a motion to dismiss.

### C. Teach-outs, faculty-retention language, and SACSCOC language do not eliminate injury.

Next, Defendants argue that no student can be injured by program closures because SB 185 refers to teach-outs, faculty retention, and SACSCOC compliance. That argument asks the Court to assume, without a record, that every future teach-out will be adequate, every affected student will graduate without disruption or additional cost, every affected faculty relationship

---

[2] In accordance with the initial disruption, KSU has tendered a Notice of Filing of the **<u>current</u>** list of programs affected by SB 185. However, KSU fails to advise that SB 185 mandates a **<u>five-year progression</u>**. As such, while the Notice of Filing identifies those programs currently affected, it certainly does not identify all programs that will continue to be affected throughout the next five (5) years, as mandated under SB 185.

will be preserved, every program change will be approved without accreditation consequences, and every mission change will be harmless. Rule 12 does not permit those inferences in Defendants' favor.

A teach-out is itself a remedial process for a program closure; it is not proof that the closure causes no injury. Students can be injured by loss of program depth, altered course sequencing, loss of electives, loss of faculty mentors, reduced research or clinical opportunities, stigma, degree-value effects, accreditation uncertainty, and the forced conversion of a continuing program into a winding-down program even if a means to graduation eventually exists. The Complaint specifically alleges that closing academic programs entails careful substantive-change and teach-out processes, including communication to enrolled, recently enrolled, and prospective students, faculty, staff, admissions personnel, and community partners; and that SB 185's expedited deadlines and five-year transition threaten to force significant changes before those processes can be completed in a careful, internally grounded way. *Compl.* ¶¶ 164-68.

Defendants' "same academic journey" assertion is also not a legal conclusion that is appropriate for a dismissal analysis. A degree earned through a forced teach-out at an institution under a state-imposed financial exigency and mission transition can differ materially from a degree earned in an ongoing, fully supported program. The difference may include course availability, sequencing, faculty access, internship and research opportunities, peer cohort effects, graduate-school and employer perception, accreditation scrutiny, and institutional reputation. Those are factual matters and are precisely the types of harms Plaintiffs plead.

Likewise, SB 185's instruction to comply with SACSCOC cannot erase accreditation injury as a matter of law. If anything, the statute's need to address SACSCOC confirms that accreditation is materially implicated. Plaintiffs need not wait for accreditation loss, program termination, faculty termination, or degree devaluation to seek prospective relief where the

alleged injury is imminent and implementation has begun. *See Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158-61 (2014).

### D. SB 185's polytechnic mission change is cognizable in this Fordice/Title VI case.

Defendants argue that "being a polytechnic institution," itself, is not a cognizable injury. However, Plaintiffs do not challenge the word "polytechnic" in isolation. They challenge a KSU-only mission rewrite imposed on Kentucky's only public HBCU after assurances to the federal government that KSU would remain Kentucky's small liberal arts University, and after federal notice of a massive land-grant funding shortfall and against a remedial history in which KSU's small liberal-arts HBCU mission was treated as a protected feature to be funded and enhanced, not a deficiency to be eliminated. *Compl.* ¶¶ 8-11, 104-08, 129-45.

The point is not that "polytechnic" is always unlawful. The point is that Kentucky previously treated KSU's small liberal-arts HBCU mission as part of the desegregation remedy, and SB 185 now subordinates that mission to a new state-imposed model while also capping academic areas, requiring program closure, and placing KSU under extraordinary CPE controls. A statutory statement that KSU will still offer some liberal studies does not eliminate the pleaded injury, because Plaintiffs challenge the narrowing of academic breadth, mission autonomy, and remedial identity, not the total disappearance of every liberal-studies course.

Under *United States v. Fordice*, 505 U.S. 717, 728-29, 731-33 (1992), the question is not whether a state can use race-neutral words or whether an isolated academic model is facially reasonable. The question is whether current policies traceable to the de jure system continue to have segregative or discriminatory effects and whether those policies can practicably be eliminated or modified.. Mission assignments, program arrays, funding, admissions, and governance are the types of higher-education policies *Fordice* requires courts to examine. Plaintiffs allege that SB 185 changes those very features at the historically Black land-grant institution while leaving the 1862 land-grant comparator untouched and while leaving the 2023

10

make-whole notice unresolved. That is a cognizable federal civil-rights injury and a plausible claim requiring discovery.

### E. Traceability and redressability are strongest as to these Defendants.

Defendants' standing argument is especially weak as to CPE, Dr. Thompson, and Mr. Silvert. SB 185 gives CPE direct implementation authority over KSU's expenditures, financial monitoring, program-review submissions, program closures, academic-area caps, admissions criteria, debt reports, and ongoing monitoring. *Compl.* ¶¶43, 47-48, 129-45. Kentucky law independently gives CPE statewide higher-education coordination and mission-approval authority. KRS §164.020. Thus, the causal chain is not attenuated: CPE is the entity SB 185 charges with approving, reviewing, amending, and overseeing the actions Plaintiffs challenge.

A favorable order against CPE and its official-capacity leaders would redress Plaintiffs' injuries. The Court could enjoin or stay CPE approval and implementation of program closures, mission changes, admissions changes, expenditure controls, and debt-enrollment mechanisms until federal claims are adjudicated; require CPE to preserve accreditation and substantive-change processes; require CPE to participate in a nondiscriminatory remedial plan; require parity reporting and no-offset protections within the scope of federal equitable relief; and prevent use of SB 185 to entrench unconstitutional effects. Article III does not require that the Court order every requested remedy on day one or that one defendant alone be able to appropriate every dollar. *Larson*, 456 U.S. at 243 n.15; *Parsons*, 801 F.3d at 715.

The Commonwealth is likewise a proper Title VI defendant because it is alleged to receive federal financial assistance and to control or substantially influence the statutory, funding, governance, and administrative framework challenged in this action. *Compl.* ¶ 42. Congress expressly provided that States are not immune under the Eleventh Amendment from suit in federal court for violations of Title VI, and that remedies at law and in equity are available to the same extent as against nonpublic entities. 42 U.S.C. §2000d-7(a).

The Attorney General is not sued for damages as an individual Title VI defendant. He is sued in his official capacity for prospective relief relating to statewide implementation and compliance with federal law. KRS §15.020 identifies the Attorney General as the chief law officer and legal adviser of the Commonwealth and its agencies, and authorizes him to appear for the Commonwealth and to challenge the constitutionality of Kentucky statutes. If the Court concludes that the Complaint should specify the Attorney General's connection more precisely, the proper remedy is leave to amend or narrowing of relief, not dismissal with prejudice of claims against all moving Defendants.

### F. Class-certification issues are premature.

Defendants' passing reliance on class-representative principles is premature. The Complaint alleges individual standing for named current students, admitted/prospective students, and alumni and separately pleads class allegations. Whether the proposed class satisfies Rule 23 is not the Rule 12(b)(1) question now before the Court. *Amchem Products, Inc. v. Windsor*, 521 U.S. 591 (1997), addresses class-certification requirements; it does not authorize dismissal of a civil-rights complaint where current students plausibly allege their own concrete injuries. At minimum, the current student Plaintiffs have standing to seek prospective relief, and class certification should be addressed on an appropriate Rule 23 record.

## II. THE COMPLAINT STATES TITLE VI CLAIMS AGAINST THE COMMONWEALTH AND CPE.

### A. Title VI applies to the Commonwealth and CPE as covered recipients/program actors.

Title VI prohibits discrimination on the ground of race, color, or national origin under any program or activity receiving federal financial assistance. 42 U.S.C. §2000d. Section 2000d-4a defines "program or activity" broadly to include all operations of a public college or university and a public system of higher education that receives federal assistance. 42 U.S.C.

§2000d-4a(2)(A). Section 2000d-7 removes Eleventh Amendment immunity for Title VI claims against States and makes legal and equitable remedies available. 42 U.S.C. §2000d-7(a).

Defendants invoke cases holding that individuals are not personally liable under Title VI. That rule does not help the Commonwealth Defendants. The Complaint herein properly names the Commonwealth and CPE as the public entities and covered higher-education actors, and it sues the individual moving officials in official capacities for prospective relief. It does not name individuals, acting in their individual capacity. *See Buchanan v. City of Bolivar*, 99 F.3d 1352, 1356-57 (6th Cir. 1996)(Title VI claim failed where plaintiff sued individual officers rather than the federally assisted school entity). Plaintiffs' Title VI claims therefore stand in the posture *Buchanan* requires: against covered entities and official-capacity actors necessary to compliance.

### B. *Plaintiffs plead intentional discrimination; they do not rely on disparate impact alone.*

Defendants argue that SB 185 is race-neutral and helpful. But Title VI and Equal Protection intent may be pleaded and proven through circumstantial evidence. *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977).The *Arlington Heights* ruling instructs courts to examine the impact of the official action, historical background, the specific sequence of events, departures from normal procedure or substance, and legislative or administrative history. *Id.* at 266-68.Discriminatory purpose need not be the sole or dominant motive. *Id.* at 265-66.

The Complaint pleads the *Arlington Heights* mosaic in detail: Kentucky's *de jure* dual land-grant system; OCR's 1981 Title VI findings; successive state desegregation plans requiring KSU enhancement; KSU's protected small liberal-arts HBCU mission; the 2023 federal notice identifying a $172,135,168 funding gap and urging make-whole relief; Kentucky's failure to adopt the requested parity/no-offset remedy; SB 185's KSU-only financial exigency, mission rewrite, program caps, expenditure controls, admissions restrictions, debt restrictions, and personnel authority; and the absence of comparable burdens on UK or other public institutions.

13

*Compl.* ¶¶ 1-22, 66-145, 311-21, 340-56. Those allegations plausibly support intentional discrimination, deliberate indifference, and adverse post-notice action.

Defendants' asserted benevolent purpose does not defeat plausibility. A statute can be supported by some benign statements and still be unlawful if other evidence supports a discriminatory purpose or if a current policy traceable to the de jure system continues to impose unlawful effects. *Fordice*, 505 U.S. at 728-33; *Arlington Heights*, 429 U.S. at 265-68. The Court may not choose Defendants' suggested inference over Plaintiffs' arguments at the Rule 12 stage. Nor does collaboration between some officials and KSU administrators immunize state action from federal review; state action remains state action when it imposes statewide statutory mandates on a historically Black public institution.

### C. The "tailored remedy" narrative is a factual defense, not a Rule 12 basis for dismissal.

Defendants repeatedly assert that SB 185 was enacted to "save" KSU from mismanagement. Even if fiscal concerns existed, that does not answer the federal question. Plaintiffs allege that KSU's fiscal vulnerability, and the claimed "mismanagement" related thereto, is itself traceable to generations of state underfunding and unresolved desegregation obligations, that federal officials specifically directed Kentucky to make KSU whole without offsetting support, and that Kentucky instead imposed extraordinary KSU-only restrictions. *Compl.* ¶¶111-28, 129-45. A State may not cite a condition it created through discriminatory underfunding as the justification for narrowing the HBCU before adopting less discriminatory remedial alternatives.

The 2022 legislation and appropriations referenced by Defendants do not defeat the Complaint either. A prior loan or conditional appropriation (in the face of substantial underfunding) is not the same as satisfying the 2023 federal make-whole notice, adopting a durable parity plan, or protecting KSU from offsets and further mission contraction. The fact that Kentucky previously recognized KSU needed support strengthens, rather than weakens, the

14

plausibility of Plaintiffs' allegation that additional KSU-only restrictions after the 2023 notice cannot be evaluated apart from the Commonwealth's remedial obligations.

Under *Fordice*, if current policies are traceable to the prior *de jure* system and continue to have discriminatory or segregative effects, the State must show that the policies are justified by sound educational reasons and that no less segregative practicable alternatives exist. *Id.* at 731-33. Whether SB 185 is a sound educational remedy, whether less discriminatory alternatives such as make-whole funding, no-offset protections, neutral fiscal controls paired with remediation, program enhancement, and federal-match compliance were practicable, and whether Kentucky's stated reasons mask or coexist with discriminatory purpose are fact questions not suitable for dismissal.

### D. *Count IV's post-notice adverse-action theory is plausible.*

The Complaint alleges that Kentucky received formal federal notice of KSU's underfunding and then imposed extraordinary KSU-only burdens without first making KSU whole or adopting no-offset protections. *Compl.* ¶¶ 116-28, 353-56. That sequence supports the intentional-discrimination and deliberate-indifference claims and also plausibly pleads adverse post-notice action. Federal civil-rights law recognizes that retaliation for opposing or participating in efforts to remedy discrimination is itself intentional discrimination in the education context. *See Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 173-84 (2005); *Peters v. Jenney*, 327 F.3d 307, 318-21 (4th Cir. 2003)(Title VI retaliation).

At minimum, Count IV should not be dismissed with prejudice. If Defendants contend that Plaintiffs must plead additional detail regarding protected activity, affected persons, or causal connection, Rule 15—not dismissal with prejudice—is the proper vehicle. The pleaded post-notice sequence remains highly probative of intent under *Arlington Heights* and of deliberate indifference under Title VI even if the Court later narrows a retaliation label.

**III. THE COMPLAINT STATES EQUAL PROTECTION, *FORDICE*, AND *ARLINGTON HEIGHTS* CLAIMS.**

**A. Fordice *requires more than rational-basis review of a facially neutral statute.***

Defendants' rational-basis framing is inconsistent with *Fordice*. In higher-education desegregation cases, a formerly *de jure* system does not satisfy federal law merely by adopting facially neutral language. The State must dismantle policies traceable to the former dual system that continue to have segregative or discriminatory effects, unless those policies are justified by sound educational reasons and cannot practicably be eliminated. *Fordice*, 505 U.S. at 728-33.

The Complaint alleges precisely that type of claim. Kentucky created a dual land-grant structure with UK as the 1862 institution and KSU as the 1890 institution for Black students; OCR found Kentucky in violation of Title VI; Kentucky's remedial plans treated KSU enhancement as a required component of desegregation; the 2009 framework required attention to KSU's HBCU status and maintenance as Kentucky's small liberal-arts university-based mission; the 2023 federal notice identified current underfunding; and SB 185 then imposed KSU-only restrictions on the same institution, in the same areas—mission, programs, funding, governance, administration, and land-grant capacity—that the remedial history required Kentucky to enhance. *Compl.* ¶¶ 57-114, 115-45, 322-52.

*Maryland Coalition* confirms the point. The District of Maryland held that students at public HBCUs could challenge current policies traceable to Maryland's *de jure* higher-education system and, after trial, found liability based on unnecessary program duplication that continued to have segregative effects and lacked sound educational justification. *Coal. for Equity & Excellence in Md. Higher Educ., Inc. v. Md. Higher Educ. Comm'n*, 977 F. Supp. 2d 507, 519-25, 544 (D. Md. 2013). *Maryland Coalition* as on all fours with this case in terms of the *Fordice* framework, student standing, and the principle that current higher-education policies affecting HBCUs can require structural remedies when traceability and effects are shown.

**B. *Plaintiffs allege traceability, continuing effects, and practicable alternatives.***

Defendants argue that SB 185 does not perpetuate segregation or limit student choice. That argument improperly strips the Complaint of its well-pleaded context. Plaintiffs allege that SB 185 burdens the historically Black institution's programs, admissions, faculty, financial autonomy, degree pathways, accreditation position, mission, and land-grant capacity after Kentucky was repeatedly told that KSU required enhancement and after federal officials identified a specific funding gap. *Compl*. ¶¶ 66-145, 146-80, 322-52. *Fordice* does not require Plaintiffs to prove at the pleading stage that each policy independently segregates enrollment on day one. It requires examination of current policies traceable to the former dual system and their ongoing effects on desegregation, equity, and equal educational opportunity.

Plaintiffs also plead practicable alternatives: make-whole funding, forward-looking federal-match compliance, no-offset protections, neutral fiscal oversight paired with remediation, program enhancement, student scholarships, faculty recruitment and retention support, infrastructure support, research and extension capacity, accreditation sequencing, monitoring, and reporting. *Compl*. ¶¶ 113-14, 121-28, 290-95, *Prayer*. Defendants may dispute the wisdom or cost of such alternatives, but *Fordice* places the practicability and sound-educational-justification inquiry in the merits, not at the pleading threshold.

Nor may Defendants preserve KSU's HBCU and land-grant status only as a label while materially changing the conditions that give those statuses educational meaning. *Fordice* looks under the proverbial covers of the facial language and requires the Court to investigate the operation and effects of state policies. If a state policy leaves the name of the HBCU intact but diminishes its academic programs, mission, faculty capacity, student services, research competitiveness, accreditation stability, and institutional attractiveness, the policy may still perpetuate vestiges or impose discriminatory effects. Plaintiffs have alleged that risk here.

The 2017 remedial phase of *Maryland Coalition* further confirms that structural higher-education desegregation relief may include new or high-demand programs, recruitment and financial-aid funding, cost estimates, implementation priorities, monitoring, reporting, and special-master supervision. *Coal. for Equity & Excellence in Md. Higher Educ., Inc. v. Md. Higher Educ. Comm'n*, 295 F. Supp. 3d 540, 546-47 (D. Md. 2017). Plaintiffs' requested remedial plan and monitoring therefore are not extraordinary judicial adventurism; they are familiar tools in higher-education desegregation cases.

### C. Arlington Heights *supports the intentional-discrimination claims.*

Plaintiffs plead historical background, sequence, comparator treatment, federal notice, adverse post-notice action, and departures from remedial commitments. *Compl.* ¶¶ 1-22, 66-145, 311-56. Those facts are exactly the type of circumstantial evidence *Arlington Heights* identifies as relevant. *Id.* at 266-68. Defendants' "helpful legislation" narrative may be their merits defense, but it does not eliminate the reasonable inference that Kentucky's post-notice KSU-only restructuring reflects intentional discrimination, deliberate indifference, or an unconstitutional perpetuation of vestiges traceable to the *de jure* system.

The Motion also argues that SB 185 does not discriminate between individuals. Title VI and Equal Protection do not permit a State to avoid scrutiny by burdening the institution through which Black students historically were required to receive land-grant education. *Fordice* exists because formally race-neutral statewide higher-education policies has the capacity to perpetuate the effects of *de jure* segregation by shaping missions, programs, funding, admissions, governance, and institutional attractiveness. Plaintiffs allege that SB 185 does that as to KSU.

### IV. THE LAND-GRANT, DECLARATORY, AND EQUITABLE CLAIMS ARE PROPERLY PLEADED AS PART OF THE FEDERAL REMEDIAL THEORY.

Defendants argue that SB 185 does not alter KSU's formal 1890 land-grant status and therefore cannot implicate federal land-grant obligations. The Complaint alleges a more

extensive injury. The 2023 federal notice did not merely recite KSU's label; it identified a concrete funding shortfall, explained how underfunding harmed infrastructure, student services, and research competitiveness, urged a substantial state allocation and forward-looking two-to-one match, and warned that remediation should not come from offsetting KSU's general support. *Compl.* ¶¶ 116-24. Plaintiffs allege Kentucky then enacted SB 185 without make-whole funding, without no-offset protection, and with KSU-only restrictions that further undermine the institution's capacity to perform its land-grant and HBCU mission. *Id.* ¶¶125-45, 357-60, 369-70.

Defendants' appeal to "agriculture and mechanic arts" also fail. The *Morrill Acts* created land-grant obligations; they did not authorize a State with a *de jure* segregated land-grant history to reduce its 1890 HBCU's broader remedial mission after federal notice of underfunding. Kentucky's own remedial framework recognized KSU's historic HBCU role and small liberal-arts mission as features to be taken into account and enhanced. *Compl*. ¶¶ 104-08.

Plaintiffs need not establish at the pleading stage an independent damages cause of action under every land-grant statute. The Complaint uses federal land-grant statutes, the 2023 federal notice, and Kentucky's federal funding obligations as predicates for declaratory and equitable relief and as evidence supporting the Title VI/*Fordice*/Equal Protection theory. The Court may consider those obligations in providing prospective relief that ensures Kentucky does not perpetuate discriminatory underfunding or impair KSU's federally protected land-grant capacity.

Nor does the separation of powers defeat redressability. Federal courts routinely order prospective compliance with federal civil-rights obligations even when compliance requires state officials to alter funding, program, monitoring, or reporting practices. The Court, in *Denton*, correctly rejected the categorical argument that funding-related relief is non-redressable merely because legislatures appropriate money. *Id.* at 1212-13. Plaintiffs seek a lawful remedial process, no-offset protections, reporting, monitoring, and prospective compliance; the Court need not write a budget to deny dismissal.

## V. THE DUE-PROCESS AND STATE-LAW CLAIMS ARE APPROPRIATELY ALLEGED.

Defendants argue that Plaintiffs identify no protected liberty or property interest. The Complaint alleges that current students have concrete interests in continued enrollment, degree pathways, program availability, faculty/advisor relationships, accreditation value, and avoidance of arbitrary admissions and debt-enrollment restrictions; admitted and prospective students allege reliance and enrollment interests; and alumni allege ongoing degree-value and accreditation/mission-related injuries. *Compl.* ¶¶181-289. Public-education due process doctrine recognizes that students have protected interests in continued access to public educational benefits once those benefits are conferred. *See Goss v. Lopez*, 419 U.S. 565, 573-76 (1975).

SB 185 imposes categorical KSU-only decisions and accelerated implementation mechanisms that affect program continuation, teach-outs, admissions standards, debt-based enrollment restrictions, and faculty continuity. Whether those interests ultimately satisfy procedural or substantive due-process standards, and what process is constitutionally required before irreversible implementation, are fact-bound questions.

The Kentucky constitutional and declaratory claims likewise involve many of the identical factual issues: whether SB 185 is arbitrary, discriminatory, or inconsistent with the Commonwealth's own remedial commitments and KSU's statutory mission. To the extent Defendants later raise sovereign-immunity or *Pennhurst* limitations on state-law relief against state officials, those issues may narrow remedies; they do not justify dismissal of the federal Title VI, Equal Protection, *Fordice*, and prospective-relief claims under Rule 12.

## VI. DEFENDANTS' RULE 12(B)(6) ARGUMENTS FAIL BECAUSE THEY ASK THE COURT TO WEIGH FACTS AND ACCEPT DEFENDANTS' INFERENCES.

The Motion repeatedly asks the Court to accept Defendants' characterization of SB 185 as benign, necessary, and harmless. But Plaintiffs allege the opposite: SB 185 is a KSU-only

emergency law enacted after federal notice of KSU underfunding, before make-whole remediation, and in direct tension with decades of Title VI/*Fordice* commitments requiring KSU enhancement. *Compl.* ¶¶ 1-22, 66-145, 311-70. At Rule 12, the Court accepts Plaintiffs' factual allegations and reasonable inferences, not Defendants' preferred narrative.

Defendants' reliance on legislative statements of good intent cannot defeat the Complaint. *Arlington Heights* specifically recognizes that intent is assessed through a sensitive inquiry into circumstantial and direct evidence. *Id.* at 266. Statements that some legislators desired to help KSU may be considered later, but they do not erase the historical background, sequence of events, federal notice, comparator treatment, mission rewrite, program caps, expenditure controls, debt restrictions, and departures from prior remedial agreements. Multiple motives are capable of coexisting, and discriminatory purpose need not be the sole purpose.

Similarly, Defendants' assertion that KSU's problems resulted from "mismanagement" is a factual defense. Plaintiffs allege that KSU's fiscal condition is inseparable from historical and ongoing state underfunding, land-grant inequity, and Kentucky's failure to make KSU whole after federal notice. *Compl.* ¶¶111-28. The Court cannot resolve that causation dispute on a motion to dismiss.

## VII. THE MOVING OFFICIALS ARE PROPER PARTIES.[3]

CPE is an institutional defendant and the central SB 185 implementer. Thompson and Silvert are official-capacity defendants who can ensure CPE compliance with any prospective order. They are not sued because of personal liability; they are sued because CPE's official actions are ongoing and because *Ex parte Young*, 209 U.S. 123, 157 (1908), permits prospective relief against state officials to stop ongoing federal violations. *Verizon Md. Inc. v. Pub. Serv. Comm'n*, 535 U.S. 635, 645 (2002).

---

[3] Plaintiffs adopt, and incorporate as if set forth in its entirety herein, the Responses to the other individual Defendants' Motions to Dismiss.

Attorney General Coleman is similarly sued only in his official capacity for relief related to statewide implementation and federal-law compliance. Plaintiffs do not need to show that he personally approves each KSU expenditure or closes each program. If the Court determines that the Attorney General's role is narrower than CPE's, the proper course is to adjust prospective relief or permit amendment, not to dismiss the claims against the direct implementing defendants or to convert an official-capacity pleading issue into a merits adjudication.

## VIII.    DISMISSAL WITH PREJUDICE IS IMPROPER.

Like the other Defendants, Commonwealth Defendants seek dismissal "with prejudice." That request is overbroad. A dismissal for lack of subject-matter jurisdiction is not an adjudication on the merits and ordinarily must be without prejudice. *Ernst v. Rising*, 427 F.3d 351, 366 (6th Cir. 2005); *Pratt v. Ventas, Inc.*, 365 F.3d 514, 522-23 (6th Cir. 2004); *Revere v. Wilmington Fin.*, 406 F. App'x 936, 937 (6th Cir. 2011).

Nor would with-prejudice dismissal under Rule 12(b)(6) be proper where any perceived deficiency could be cured by amendment. Rule 15(a)(2) directs courts to freely give leave when justice so requires, and the Sixth Circuit applies that rule liberally. *Brown v. Matauszak*, 415 F. App'x 608, 614-16 (6th Cir. 2011); *Morse v. McWhorter*, 290 F.3d 795, 800 (6th Cir. 2002). If the Court believes Plaintiffs should plead additional detail about specific student harms, post-filing program actions, CPE implementation measures, Attorney General responsibilities, class subclasses, retaliation particulars, or due-process interests, Plaintiffs can amend. Dismissal with prejudice would be especially inappropriate at the first pleading challenge in a complex Title VI/*Fordice* higher-education case.

## CONCLUSION

Plaintiffs have pleaded concrete and imminent injuries arising from Kentucky's failure to remedy federally identified KSU underfunding and from SB 185's KSU-only emergency restructuring. They sue the Commonwealth and CPE as covered public higher-education actors

22

and federal-funding recipients, and they sue Coleman, Thompson, and Silvert in their official capacities for prospective relief tied to statewide implementation and ongoing federal compliance. The Motion's standing, third-party-standing, Title VI, Equal Protection, *Fordice*, land-grant, due-process, and class-certification arguments either misstate the Complaint, ask the Court to accept Defendants' disputed narrative, or raise fact-bound issues unsuitable for Rule 12. Plaintiffs respectfully request that the Court deny the Motion to Dismiss in its entirety. In the alternative, any dismissal should be without prejudice and with leave to amend.

MORRIS & MORRIS, P.S.C.

By:　　*/s/ James M. Morris*
　　　　James M. Morris
　　　　Tyler J. Morris
　　　　Sharon K. Morris
217 North Upper Street
Lexington, Kentucky 40507
Telephone: (859) 281-6981
Facsimile:  (859) 233-7876
ATTORNEYS FOR PUTATIVE CLASS