UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
(at Frankfort)

| | | |
|---|---|---|
| SAMANTHA WIGGINTON, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | Civil Action No. 3:26-CV-035-CHB |
| | ) | |
| v. | ) | |
| | ) | **MEMORANDUM OPINION** |
| COMMONWEALTH OF KENTUCKY, | ) | **AND ORDER** |
| *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

Kentucky State University ("KSU") serves as Kentucky's 1890 land-grant institution, as well as the Commonwealth's only public Historically Black College or University ("HBCU"). In recent years, the university has faced significant operational, financial, and accreditation struggles. After consulting with KSU, Kentucky's Council on Post-Secondary Education ("CPE"), and other stakeholders, Kentucky's legislature passed Senate Bill ("SB") 185 during the 2026 legislative session. SB 185 declares a "state of financial exigency" at KSU and, among other things, revises aspects of the university's mission, defining it as a four-year polytechnic institute "that focuses on highly technical, industry-based applied learning and offers liberal studies and polytechnic programs that are aligned with the workforce needs of the Commonwealth and consistent with the historical mission of an HBCU." Plaintiffs, current students and alumni, brought this lawsuit, arguing SB 185 violates federal law.

It is clear all parties care deeply about the history and future of KSU. The parties disagree, however, on the circumstances that led to its current operational, financial, and accreditation problems and whether SB 185 violates federal law. Plaintiffs contend that KSU's current struggles

- 1 -

stem from decades of underfunding KSU relative to its peers, and that such underfunding is traceable to Kentucky's historical era of de jure segregation, the effects of which the state has failed to remedy in violation of Title VI and the Equal Protection Clause. In their eyes, SB 185 unlawfully narrows KSU's mission and related programming and continues the "underfunding and structural subordination of KSU." Defendants, however, largely point to internal mismanagement as the cause of KSU's financial exigency and accreditation uncertainty. They believe these problems "require a creative solution to ensure [KSU] has the tools and resources at its disposal necessary to grow and thrive as it continues its vital mission as Kentucky's only public HBCU." To Defendants, SB 185 is that "creative solution."

The Court need not (indeed, cannot) resolve the entire dispute today. Instead, the current question before the Court is much narrower. Plaintiffs have filed a motion seeking a temporary restraining order enjoining the implementation of SB 185. The Court's task, then, is to determine whether Plaintiffs have met the high burden for emergency injunctive relief. With this limited scope in mind, and based on the current, largely undeveloped record, the Court finds Plaintiffs have failed to meet their burden and will deny the motion for the reasons outlined below.

## I.      BACKGROUND

Before turning to the specific allegations of this case, the Court finds it helpful to first summarize the relevant historical background.[1]

KSU is a land-grant university. Land-grant universities were first established under federal law that allotted thousands of acres of federally owned land to several states, including Kentucky. *See* 7 U.S.C. § 301. The law required that the land be sold and the proceeds used to establish, support, and maintain one or more colleges focused on agriculture and the mechanical arts. *See id.*

---

[1] For purposes of the pending request for a temporary restraining order, the parties do not appear to dispute this historical background.

§ 304; *Denton v. Bd. of Governors for the State Univ. Sys. of Florida* (*Denton I*), 713 F. Supp. 3d 1207, 1222 (N.D. Fla. 2024), *affirmed in part and reversed in part by Denton v. Bd. of Governors for the State Univ. Sys. of Florida* (*Denton II*), No. 25-10567, 2026 WL 1660092 (11th Cir. June 9, 2026). After the passage of the first such law, the Morrill Act of 1862,  Kentucky established its first land-grant institution, now known as the University of Kentucky. *See, e.g.*, [R. 1, ¶ 57]. Later, the Second Morrill Act of 1890 required states to either admit black students to their 1862 land-grant universities or otherwise establish separate land-grant universities for black students, with the funding being "equitably divided" between the separate schools. *See* 7 U.S.C. §§ 322, 323; *Denton I*, 713 F. Supp. 3d at 1222. In response, Kentucky, like many states, established a separate college for black students, the institution now known as KSU. *See, e.g.*, [R. 1, ¶¶ 58–60].

In 1954, the Supreme Court held that such "separate but equal" educational facilities are inherently unequal and therefore violate the Fourteenth Amendment's Equal Protection Clause. *See Brown v. Board of Education*, 347 U.S. 483, 495 (1954) (*Brown I*). The following year, the Supreme Court ordered that segregated public education be ended "with all deliberate speed." *Brown v. Board of Education*, 349 U.S. 294, 301 (1955) (*Brown II*); *see also United States v. Fordice*, 505 U.S. 717, 721 (1992) (discussing *Brown I* and *Brown II*). Nevertheless, some states failed to effectively dismantle the remnants of de jure segregation. *See, e.g.*, *Fordice*, 505 U.S. at 721 (discussing Mississippi's failure to end its policy of de jure segregation after *Brown I* and *Brown II*). For instance, while state laws no longer permitted segregation, certain admissions standards and the "widespread duplication of programs" "substantially restrict[ed] a person's choice of which institution to enter" and "contribute[d] to the racial identifiability" of those public universities. *Id.* at 733. As such, these states had failed to "dismantle the dual school system[s] that [their] laws once mandated." *Id.* at 727.

For example, in 1981, the U.S. Department of Education's Office for Civil Rights ("OCR") notified the Commonwealth of Kentucky that "it was operating a racially segregated system of higher education in violation of Title VI of the Civil Rights Act of 1964." [R. 1-4, p. 4 (2009 Report)]. As a result, Kentucky developed a five-year plan "designed to provide the remedial activities necessary to meet the mandates of Title VI for public institutions of higher education in Kentucky." *Id.* Throughout the next five years, Kentucky submitted yearly progress reports to OCR, and in 1987, a draft final report "describing the accomplishments achieved under the" 1983 plan. *Id.* Ultimately, however, no final report was issued "and Kentucky was not advised as to its status under the" 1983 plan. *Id.*

Nevertheless, "[a]fter the original 1983 plan expired, Kentucky continued its efforts to eliminate the vestiges of its formerly dual system of higher education." *Id.* at 6. Specifically, the Commonwealth developed a second plan "which contained the identical actions, goals, and objectives as the 1983 plan." *Id.* That second plan lasted from 1990 to 1997, at which time Kentucky adopted a third plan, which lasted from 1997 to 2002. *Id.*

Meanwhile, in 1992, the Supreme Court decided *United States v. Fordice*, 505 U.S. 717 (1992). In that case, the Supreme Court made clear that a state "does not discharge its constitutional obligations until it eradicates policies and practices traceable to its prior de jure dual system that continue to foster segregation." *Id.* at 728. In other words, "*Fordice* requires elimination of vestiges of de jure segregation in a state's system of higher education." *Denton I*, 713 F. Supp. 3d at 1215. If a state fails to eradicate such segregative policies "to the extent practicable and consistent with sound educational policies," it violates the Fourteenth Amendment and Title VI of the Civil Rights Act. *Fordice*, 505 U.S. at 729, 743; *see also Knight v. State of Alabama*, 14 F.3d 1534, 1540–42 (11th Cir. 1994) (discussing *Fordice*).

In 1999, Kentucky's governor was advised that OCR would be examining Kentucky's system of higher education in light of *Fordice*. [R. 1-4, p. 6]. OCR and the Commonwealth ultimately "agreed to pursue a collaborative approach to address concerns regarding the status of African Americans in Kentucky's public universities." *Id.* As a result, in 2000, OCR and the Kentucky Council on Postsecondary Education ("CPE") executed an agreement (the "Partnership Agreement"), with the parties' commitments being organized into two broad categories: (1) "strategies to enhance KSU" and (2) "strategies to enhance the initiatives at traditionally white universities in the areas of campus climate, student recruitment and student retention." *Id.* at 7. OCR monitored the Commonwealth's performance of its commitments and issued periodic written reports. *Id.* In 2009, OCR issued its final report (the "2009 Report"). In that thirty-three-page report, OCR concluded that the Commonwealth had fulfilled each of its commitments under the Partnership Agreement. *Id.* at 3–35; *see also id.* at 1 (Cover Letter to the 2009 Report, referencing OCR's "findings and conclusion that the Commonwealth is in compliance with Title VI and its implementing regulation with respect to the issues addressed in the [Partnership] Agreement").

In 2023, the U.S. Department of Education and the U.S. Department of Agriculture sent a letter to Kentucky's governor (the "2023 Letter"). [R. 1-5 (2023 Letter)]. The letter, which spans just over two pages, asserted that KSU "has not been able to advance in ways that are on par with the University of Kentucky . . . in large part due to unbalanced funding." *Id.* at 1. It further asserted that "[u]nequitable funding of [KSU] has caused a severe financial gap," and "in the last 30 years alone, an additional $172,135,168 would have been available for the university." *Id.* at 2. To remedy this alleged funding disparity, the letter suggested "state allocation" and amendments to the state budget. *Id.*

With this historical backdrop in mind, the Court turns to the relevant facts giving rise to

the current lawsuit.

Today, KSU is not only Kentucky's 1890 land-grant institution, it is also the state's only public HBCU. *See, e.g.*, [R. 1, ¶ 1]. In recent years, as the parties agree, the university has faced significant operational and financial struggles, as well as accreditation concerns. *See, e.g.*, [R. 1, ¶¶ 258–263]; [R. 24, p. 1]; [R. 23, p. 2]. During the 2026 legislative session, Kentucky's legislature passed SB 185. *See* [R. 1-6 (SB 185)]. Among other things, SB 185 declares a "state of financial exigency" at KSU for the next five years. *Id.* at 1. It also removes language from Kentucky Revised Statute ("KRS") § 164.290 that stated the General Assembly's intent that KSU "shall serve as a four (4) year residential institution emphasizing a program of liberal studies appropriate to its size and resources." *Id.* at 7. It then creates new sections of KRS Chapter 164, one of which defines KSU as a four-year polytechnic institute "that focuses on highly technical, industry-based applied learning and offers liberal studies and polytechnic programs that are aligned with the workforce needs of the Commonwealth and consistent with the historical mission of an HBCU." *Id.* at 1. SB 185 also requires CPE to approve obligations or expenditures of $20,000 or more, *id.* at 1, requires KSU to deny admission, readmission, or enrollment to any individual owing KSU more than $1,000 for more than sixty days, *id.* at 5, requires KSU to submit quarterly reports to CPE detailing outstanding balances of $1,000 or more that have been due and owing for more than sixty days, *id.* at 5–6, limits KSU to no more than ten academic areas of study, *id.* at 3, requires the Board of Regents, with the assistance of CPE, to propose programs for closure and seek approval for closure from KSU's accrediting body, *id.* at 2–3, and authorizes the termination of any KSU employee, *id.* at 3–4, among other things, which are discussed in more detail below. *See infra* Sections III.B.1.b, III.C. SB 185 also provided that, "[w]hereas [KSU] is in a state of financial exigency that needs to be remedied, an emergency is declared to exist, and this Act takes effect upon its passage and

- 6 -

approval by the Governor or upon its otherwise becoming a law." [R. 1-6, p. 7]. Governor Andy Beshear signed SB 185 into law on April 13, 2026.

Shortly thereafter, on May 11, 2026, Plaintiffs initiated this putative class action. *See id.* The plaintiffs include several current and former students of KSU, individually and on behalf of all similarly situated current students, alumni, prospective students, and admitted students of KSU. *Id.* ¶¶ 29–41. They name as defendants the Commonwealth of Kentucky, Russell Coleman, the Attorney General of Kentucky, the CPE, Aaron Thompson, the President of the CPE, and Madison Silvert, the Chair of the CPE (collectively, the "Commonwealth Defendants"); the KSU Board of Regents, Tammi Dukes, the Chair of the KSU Board of Regents, and Koffi C. Akakpo, the President of KSU (collectively, the "KSU Defendants"); Andy Beshear, the Governor of Kentucky; Holly M. Johnson, the Secretary of the Kentucky Finance and Administration Cabinet; and Thomas B. Miller, the Commissioner of the Kentucky Department of Revenue.[2] *See id.* ¶¶ 42–53.

Against these defendants, the plaintiffs assert eight causes of action, including intentional discrimination in violation of Title VI of the Civil Rights Act, 42 U.S.C. § 2000d (Count I); a 42 U.S.C. § 1983 claim premised on violations of the Fourteenth Amendment's Equal Protection Clause under *United States v. Fordice*, 505 U.S. 717 (1992) (Count II); a § 1983 claim for violations of the Fourteenth Amendment's Equal Protection Clause under *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977) (Count III); a claim for "retaliation or adverse post-notice action" in violation of Title VI (Count IV); and other claims which, from the best the Court can decipher, are premised on violations of statutory land-grant obligations, procedural due process, the Kentucky constitution, and "related state law."

---

[2] Each of the individual defendants is sued in his or her official capacity. *See* [R. 1, ¶¶ 42–53].

(Counts V–VIII). *See* [R. 1, ¶¶ 311–370].

These claims stem from allegations that Kentucky has failed to fulfill its obligations to remedy the vestiges of its past system of de jure segregation. In other words, Plaintiffs allege that Kentucky continues to implement policies traceable to its former system of de jure segregation, resulting in "continuing inequitable effects" that "threaten KSU's mission, programs, faculty, facilities, funding capacity, land-grant activities, and administration." [R. 1, ¶ 114]; *see also id.* ¶ 330. According to Plaintiffs, SB 185 is one such policy. *See, e.g., id.* ¶ 335.

To enjoin the enforcement of SB 185, Plaintiffs have filed the pending request for a temporary restraining order. [R. 2]. Specifically, Plaintiffs seek an order that enjoins Defendants

> from enforcing, implementing, directing, approving, or requiring implementation of SB 185 in any manner that irreversibly or practically irreversibly alters KSU's academic program array, mission, accreditation posture, student access, faculty-student relationships, degree pathways, land-grant functions, or HBCU identity before the Court can hold a preliminary-injunction hearing.

*Id.* at 5. By agreement of the parties, the Court entered an expedited briefing schedule and set the matter for a hearing. *See* [R. 18]; [R. 19]. Responses have now been filed by Commissioner Miller, [R. 20], Governor Beshear, [R. 21], Secretary Johnson, [R. 22], the Commonwealth Defendants, [R. 23], and the KSU Defendants, [R. 24]. Plaintiffs have replied. [R. 25]; [R. 26]; [R. 27]. Upon review of those briefs, the Court determined that a hearing was no longer necessary, and it remanded that hearing from the Court's calendar. [R. 29]. This matter is therefore ripe for review. For the reasons set forth below, the Court will deny Plaintiffs' request for a temporary restraining order.

## II.     LEGAL STANDARD

Federal Rule of Civil Procedure 65 governs the issuance of temporary restraining orders. *See* Fed. R. Civ. P. 65. The Sixth Circuit has described a temporary restraining order as "an

extraordinary remedy designed for the limited purpose of preserving the status quo pending further proceedings on the merits." *Stein v. Thomas*, 672 F. App'x 565, 572 (6th Cir. 2016).

In determining whether to grant such relief,

> the Court considers the same four factors applicable to a motion for preliminary injunction: (1) the movant's likelihood of success on the merits; (2) whether the movant "would likely be permanently harmed absent the injunction; (3) whether the injunction would cause substantial harm to third parties; and (4) whether the injunction would serve the public interest."[3]

*Dinter v. Miremami*, 627 F. Supp. 3d 726, 730 (E.D. Ky. 2022) (quoting *McGirr v. Rehme*, 891 F.3d 603, 610 (6th Cir. 2018)). However, while the standard for a temporary restraining order is the same as that for a preliminary injunction, "there is an increased emphasis on irreparable harm." *Id.* (citations omitted); *see also Ecolab, Inc. v. Shanklin*, No. 3:23-CV-215-CHB, 2023 WL 4365933, at *2 ("Importantly, while this inquiry requires the Court to balance multiple factors, 'the existence of an irreparable injury is mandatory.'" (quoting *Ohio v. Becerra*, No. 21-4235, 2022 WL 413680, at *2 (6th Cir. Feb. 8, 2022))).

Importantly, "[a] party seeking a temporary restraining order bears the burden of making a 'clear showing'" that he or she is entitled to such relief. *Rayford v. Wells Fargo Bank, N.A.*, No. 5:25-CV-348-KKC, 2026 WL 1262970, at *3 (E.D. Ky. May 1, 2026) (citing *Winter v. NRDC*, 555 U.S. 7, 22 (2008)). Indeed, given that temporary restraining orders (and preliminary injunctions) are "extraordinary and drastic remed[ies]," they are "never awarded as of right," and instead, "[t]he standards governing both remedies are necessarily high." *N.R. by and through Ratliff v. Pike Cnty. School Dist. Bd. of Educ.*, No. 21-78-HRW, 2022 WL 837724, at *2 (E.D. Ky.

---

[3] Federal Rule of Civil Procedure 65 imposes additional requirements when the temporary restraining order is issued without notice to the adverse party. *See* Fed. R. Civ. P. 65(b). However, in the present case, there is no dispute that each defendant has received notice of Plaintiffs' request for a temporary restraining order, as those defendants have appeared (by counsel), some participated in a telephonic status conference, and all defendants have filed a response to Plaintiffs' motion.

Mar. 21, 2022) (quoting *Munaf v. Geren*, 553 U.S. 674, 690–91 (2008)) (internal quotation marks omitted). Ultimately, the decision to grant or deny a temporary restraining order is within the discretion of the district court. *Dinter*, 627 F. Supp. 3d at 730 (citation omitted).

### III.    ANALYSIS

In their motion, Plaintiffs rely on three claims to support their request for a temporary restraining order: Count I, the claim for intentional discrimination in violation of Title VI; Count II, the § 1983 claim for violations of the Fourteenth Amendment's Equal Protection Clause under *Fordice*; and Count III, a § 1983 claim for violations of the Fourteenth Amendment's Equal Protection Clause under *Arlington Heights*. *See* [R. 2, pp. 13–16].[4] The defendants argue that Plaintiffs lack standing to pursue these claims and regardless, Plaintiffs have otherwise failed to meet the requirements for injunctive relief under Rule 65. *See* [R. 20, p. 3]; [R. 21, p. 2]; [R. 22, p. 2]; [R. 23, pp. 6–9]; [R. 24, p. 7]. The Court first considers the defendants' standing arguments before evaluating the defendants' other arguments.

### A.  Standing

Importantly, "[s]tanding is a jurisdictional requirement grounded in Article III of the Constitution." *Moms for Liberty-Wilson Cnty., Tenn. v. Wilson Cnty. Bd. of Educ.*, 155 F.4th 499, 508 (6th Cir. 2025). Thus, although a standing analysis is "not an inquiry into a claim's merits, [it] is still 'relevant to [the] likelihood of success [on the merits] inquiry." *Id.* at 509 (quoting *Arizona v. Biden*, 40 F.4th 375, 383 (6th Cir. 2022)); *see also Ne. Ohio Coal. for Homeless & Serv. Emps. Int'l Union, Loc. 1199 v. Blackwell*, 467 F.3d 999, 1010 (6th Cir. 2006) ("In evaluating [the]

---

[4] Plaintiffs also made clear during the May 20, 2026 telephonic status conference that they rely on only these three claims to support their request for a temporary restraining order, although they briefly discuss the facts and issues surrounding their other claims for context. *See, e.g.*, [R. 2, p. 16 (discussing land-grand, due process, and accreditation issues outlined in the other claims)].

plaintiffs' likelihood of success on the merits, we examine first the issue of standing."). This "stands to reason because an affirmative burden of showing a likelihood of success on the merits . . . necessarily includes a likelihood of the court's reaching the merits, which in turn depends on a likelihood that [the] plaintiff has standing." *Moms for Liberty*, 155 F.4th at 509 (quoting *Waskul v. Washtenaw Cnty. Cmty. Mental Health*, 900 F.3d 250, 255–56 n.4 (6th Cir. 2018)) (citation modified); *see also Blackwell*, 467 F.3d at 1010 ("The weakness of [the] plaintiffs' showing of standing leads us to conclude that their likelihood of success on the merits is not strong."). The Court therefore considers the parties' standing arguments, to the extent they raised such arguments in response to Plaintiffs' request for a temporary restraining order.[5]

To establish Article III standing, a plaintiff "must have suffered or be imminently threatened with a concrete and particularized 'injury in fact' that is fairly traceable to the challenged action of the defendant and likely to be redressed by a favorable judicial decision." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 125 (2014) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)). Stated another way, "a plaintiff must demonstrate (1) an injury in fact that is (2) caused by the defendant's conduct and (3) redressable by a favorable court decision." *Moms for Liberty*, 155 F.4th at 509  (citation omitted). The plaintiff bears the burden of establishing each of these elements "with the manner and degree of evidence required at the successive stages of the litigation." *Id.* (quoting *Lujan*, 504 U.S. at 561). Thus, when requesting a temporary restraining order or preliminary injunction, a plaintiff "must make a 'clear

---

[5] The defendants have also filed various motions to dismiss, each of which raises the issue of standing. *See* [R. 28]; [R. 30]; [R. 31]; [R. 32]; [R 33]. However, those motions are not yet ripe, and as explained herein, Plaintiffs are required to establish the elements of standing "with the manner and degree of evidence required at the successive stages of litigation." *Moms for Liberty.*, 155 F.4th at 509. At this stage of the litigation, where Plaintiffs request a temporary restraining order, they must make a "clear showing" that they are likely to establish each element of standing. *Id.* Because the motions to dismiss do not address that precise standard (and are not ripe), the Court does not consider those arguments when addressing the matter currently before it, that is, Plaintiffs' request for a temporary restraining order.

showing' [through evidence] that [he or she] is 'likely' to establish each element of standing." *Id.* (quoting *Murthy v. Missouri*, 603 U.S. 43, 58 (2024)).

As an initial matter, the Court notes that Commissioner Miller, Governor Beshear, Secretary Johnson, and the KSU Defendants fail to recite the elements of standing, they wholly fail to engage with or develop a standing analysis, and they likewise fail to cite any applicable legal authority on this issue. *See* [R. 20, p. 3]; [R. 21, p. 2]; [R. 22, p. 2]; [R. 24, p. 7]. A party may not "mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones," as these defendants have done. *McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997). Accordingly, the Court need not consider these defendants' perfunctory and undeveloped standing arguments, to the extent they are raised in their responses to Plaintiffs' request for a temporary restraining order. *See generally United States v. Miller*, 2:08-CV-11499-TGB, 2023 WL 2603935, at *4 (E.D. Mich. Mar. 22, 2023) ("Arguments raised in a perfunctory manner and unsupported by authority are deemed waived, even when those arguments raise constitutional issues." (citing *Crespo v. Colvin*, 824 F.3d 667, 674 (7th Cir. 2016))).

The Commonwealth Defendants do cite to the three elements of standing, that is, an injury in fact, traceability (i.e., causation), and redressability. [R. 23, p. 6]. But rather than discuss whether the named plaintiffs can satisfy these elements and sue individually, they focus their argument only on whether Plaintiffs have standing to assert claims *on behalf of KSU*, or in other words, whether Plaintiffs can satisfy third-party standing requirements. *Id.* at 6–9. However, as Plaintiffs make clear in their complaint and their reply brief, they are not seeking to assert claims on behalf of KSU. *See, e.g.*, [R. 26, pp. 5–7]. Accordingly, the Court need not address the Commonwealth Defendants' standing arguments, which again only address whether the plaintiffs have satisfied the test for third-party standing.

Regardless, in cases involving similar allegations and claims, courts have held that current and former HBCU students, who claimed they were "subjected to ongoing segregative policies traceable to [a] de jure era" of segregation, had alleged a justiciable injury. *Coalition*, 977 F. Supp. 2d at 520. For example, in *Coalition*, an organization comprised of current and former students of a Maryland HBCU[6] alleged that the state of Maryland had failed to eradicate the vestiges of its earlier era of de jure segregation, thereby violating Title VI and the Fourteenth Amendment's Equal Protection Clause. *Id.* at 519. In considering whether these students had shown a sufficient injury in fact,[7] the United States District Court for the District of Maryland explained that "attendance at an educational institution affected by segregative policies traceable to a prior de jure system may constitute an injury, regardless of the institution's resources or quality." *Id.* (citing *Brown I*, 347 U.S. at 495); *see also Allen v. Wright*, 468 U.S. 737, 756 (1984) ("[The] diminished ability to receive an education in a racially integrated school—is, beyond any doubt, not only judicially cognizable but, . . . one of the most serious injuries recognized in our legal system."). The *Coalition* court ultimately concluded that the plaintiffs had standing to challenge those allegedly segregative policies. *Coalition*, 977 F. Supp. 2d at 519–20.

Similarly, in *Denton I*, 713 F. Supp. 3d 1207, the plaintiffs—students seeking to represent a class of all black students at a Florida HBCU—sufficiently alleged Article III standing. That is, they alleged "their own educations [were] being adversely affected by the racial discrimination they say [the HBCU] is currently suffering." *Id.* at 1212. The district court explained that "[t]his is a sufficient allegation of a concrete and particularized injury that is both actual and imminent,

---

[6] The *Coalition* court referred to the HBCUs as historically black institutions, or HBIs. *See, e.g.*, *Coalition*, 977 F. Supp. 2d at 512. For consistency, this Court refers to them as HBCUs.

[7] The plaintiff in *Coalition* was an organization founded to support Maryland's historically black institutions of higher education, with members including current and former students of such institutions. *Coalition*, 977 F. Supp. 2d at 512. The district court explained that associational standing would exist so long as "any one" member of the organization would have standing to sue individually. *Id.* at 519 (citations omitted).

- 13 -

not conjectural or hypothetical"; that alleged injury was traceable to the defendants, namely the state of Florida and the Board of Governors of the State University System, as they were the entities responsible for implementing the allegedly discriminatory actions; and the injury was redressable through an injunction requiring the defendants to "take appropriate action" and treat the HBCU and its students in a manner that complied with Title VI and the Fourteenth Amendment. *Id.*

The Eleventh Circuit ultimately "agree[d] with the district court's thoughtful standing analysis." *Denton II*, 2026 WL 1660092, at *1; *see also id.* at *4–8. As for the injury-in-fact prong, the Eleventh Circuit explained that a sufficiently concrete harm "need not be tangible," and "[i]t's also not necessary for harms to be direct." *Id.* at *4 (citations omitted). Moreover, "future injuries can establish standing." *Id.* And importantly, "students' 'diminished ability to receive an education in a racially integrated school—is, beyond any doubt, not only judicially cognizable but . . . one of the most serious injuries recognized in our legal system.'" *Id.* at *5 (quoting *Allen*, 468 U.S. at 756). Having reviewed this authority, the Eleventh Circuit concluded that the student-plaintiffs adequately pled an injury in fact, namely, that they "have suffered (and will continue to suffer) diminished educational opportunities because of the alleged underresourcing, underfunding, and challenged curricular policies concerning" Florida's HBCU. *Id.*

The Eleventh Circuit went on to explain that those alleged injuries were "connected with, and fairly traceable to, the [defendants'] conduct." *Id.* at *6. The defendants, which included the state of Florida, its Commissioner of Education, the Board of Governors of the State University System of Florida, and various board members, were responsible for managing the state's universities, making certain funding and budgeting decisions, and controlling and disbursing federal funds. *Id.* They had "allegedly failed to dismantle the segregative effects of de jure segregation, by failing to adequately resource and fund [Florida's HBCU] (especially relative to

- 14 -

Florida's [historically white institutions]) and by failing to modify [the HBCU's] curricular offerings to make the school relatively more attractive." *Id.* Thus, the students' injuries (i.e., the diminished educational opportunities) were fairly traceable to the defendants' alleged conduct. *Id.*; *see also id.* at *7 ("[The students] challenge the policies and practices that the [defendants] have implemented—which, in turn, have allegedly adversely affected their educational opportunities as current [Florida HBCU] students. Those injuries are traceable to the [defendants'] conduct.").

Lastly, the Eleventh Circuit considered whether the alleged injuries were redressable. *Id.* at *7–8. It explained,

> It is substantially likely that if the [defendants] increased the funding or curricular offerings at [the HBCU], the injuries the Students point to—having lesser educational opportunities—would be redressed. In other words, it is substantially likely that an injunction ordering the [defendants] to increase the funding, resources, or curricular offerings at [the HBCU] would bring [the HBCU] in line with the mandates of *Fordice*, Title VI, and the Fourteenth Amendment.

*Id.* at *7. Having concluded that the student-plaintiffs sufficiently alleged an injury in fact that was fairly traceable to the defendants' alleged conduct and redressable, the Eleventh Circuit found that they had standing to pursue their claims under *Fordice*, Title VI, and the Equal Protection Clause. *Id.* at *8.

These cases, which again involve similar Title VI and Equal Protection Clause claims, suggest that the plaintiffs in this case are likely to demonstrate standing on at least some of their claims and theories. Indeed, like the students in those cases, these plaintiffs—also current and former students of an HBCU—allege that their educations have been and are being adversely affected by the racial discrimination that KSU allegedly suffers. *See generally* [R. 1]. Thus, like the students in the *Denton* line of cases, these plaintiffs allege they "have suffered (and will continue to suffer) diminished educational opportunities because of the alleged underresourcing, underfunding, and challenged curricular policies concerning" KSU. *Denton II*, 2026 WL 1660092,

at \*5. As to the cause of that alleged injury, they also point to the "policies and practices that the [defendants] have implemented," such as SB 185, and they allege that those policies and practices have "affected their educational opportunities as current [KSU] students" and alumni. *Id.* at \*7. And the permanent injunctive (and monetary) relief they seek has the power to redress the alleged injury (i.e., diminished educational opportunities) by increasing the school's funding and resources. *Id.*

Thus, at this stage of the proceedings, the plaintiffs are likely to demonstrate standing. And again, Commissioner Miller, Governor Beshear, Secretary Johnson, and the KSU Defendants wholly fail to develop their standing arguments, and the Commonwealth Defendants argue only that the plaintiffs cannot satisfy the requirements of third-party standing. While the Court finds that Plaintiffs have sufficiently demonstrated standing for the purposes of the pending request for a temporary restraining order, the Court nevertheless concludes that they have failed to demonstrate a likelihood of success on the merits, as discussed below.

## B. Likelihood of Success on the Merits

To demonstrate a "likelihood of success on the merits," a movant must show that it has a "reasonable probability that it will prevail on the merits." *Dinter*, 627 F. Supp. 3d at 730 (quoting *Trefelner ex rel. Trefelner v. Burrell Sch. Dist.*, 655 F. Supp. 2d 581, 589 (W.D. Pa. 2009)). In their motion, Plaintiffs argue that they are likely to prevail on the merits of their Title VI claim (Count I) and their Equal Protection Clause claims (Counts II and III). *See* [R. 2, pp. 13–16]. From the complaint and the briefing in this matter, as well as the relevant case law, the Court understands the Plaintiffs rely on *Fordice* to support their Title VI[8] and first Equal Protection Clause claims

---

[8] To be sure, it is not entirely clear from the complaint or the pending motion that Plaintiffs rely on *Fordice* to support their Title VI claim. *See* [R. 1, ¶¶ 311–321]; [R. 2, pp. 13–14]. However, from the case law cited by Plaintiffs, and their reply briefs, the Court understands that they *do* rely on *Fordice* to support their Title VI claim. *See* [R. 27, pp. 6–7].

(Counts I and II), and they bring their second Equal Protection Clause claim (Count III) separate and apart from *Fordice*, relying instead on *Arlington Heights*. The Court therefore refers to Counts I and II as Plaintiffs' *Fordice* claims and Count III and Plaintiffs' *Arlington Heights* claim.

### 1.   Plaintiffs' *Fordice* Claims (Counts I and II)

As to the *Fordice* claims, the Court understands that Plaintiffs rely primarily on the following alleged policies or practices, which Plaintiffs argue are traceable to Kentucky's de jure era of segregation and either prompted or are a consequence of SB 185: underfunding; mission narrowing; and programming or curricular changes. To determine whether Plaintiffs are likely to succeed on the merits of these claims, the Court first surveys the relevant law and will then address Plaintiffs' specific arguments.

### a.   Relevant Law

As already explained, the Court understands that Plaintiffs rely on *Fordice* to support both their Title VI claim (Count I) and their first Equal Protection Clause claim (Count II). Under Title VI of the Civil Rights Act, no person "shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. Similarly, the Fourteenth Amendment's Equal Protection Clause guarantees that a state may not "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV § 1. In *Fordice*, the Supreme Court held that states have both a constitutional duty under the Equal Protection Clause, as well as a duty under Title VI, to dismantle the "separate but equal" dual school systems that existed during the era of de jure segregation. *Fordice*, 505 U.S. at 727–28, 743; *see also Denton I*, 713 F. Supp. 3d at 1215 (explaining that the requirements of *Fordice* "stem[] from both Title VI of the Civil Rights Act of 1964 and the Fourteenth Amendment"). Thus,

a plaintiff may bring a Title VI claim and a § 1983 Equal Protection Clause claim, with both claims relying on a *Fordice* analysis. *See Denton II*, 2026 WL 1660092, at *1 (explaining that the student-plaintiffs brought "a *Fordice* claim under Title VI," and "a *Fordice* claim under 42 U.S.C. § 1983 and the Equal Protection Clause," as well as a separate racial-discrimination claim under § 1983 and the Fourteenth Amendment).

*Fordice* outlines a three-part test. First, "the state must perpetuate a policy or practice 'traceable to its prior system' of de jure segregation" (the "traceability prong"). *Id.* at *9. Second, "that policy or practice must 'continue to have segregative effects'" (the "continuing-effects prong"). *Id.* And third, "the policy must be 'without sound educational justification' and capable of being 'practicably eliminated'" (the "redressability prong"). *Id.* While the parties spend little time engaging with this test, the Court finds it helpful to discuss its requirements in more detail before considering the parties' arguments.

As to the first prong (i.e., the traceability prong), the plaintiff must first show that a "particular policy that has been challenged as segregative is 'traceable' to decisions that were made or practices that were instituted in the past for segregative reasons, thus rendering it a vestige of segregation." *Coalition*, 977 F. Supp. 2d at 523 (citing *Knight*, 14 F.3d at 1540). "In other words, once a court determines 'that a particular policy was originally adopted for discriminatory reasons, the *Fordice* test inquires whether the current policy is traceable to the original tainted policy, or is rooted or has its antecedents in that original policy.'" *Denton II*, 2026 WL 1660092, at *10 (quoting *Knight*, 14 F.3d at 1550) (citation modified). However, "an otherwise legitimate interim justification for perpetuation of a policy is insufficient to break the causal chain." *Id.* (quoting *Knight*, 14 F.3d at 1550) (internal quotation marks omitted). Moreover, it is not sufficient for the defendants to show that "current policies are race-neutral," nor is it sufficient for the plaintiff to

show "a present imbalance in resources without identifying a current policy or practice rooted in de jure segregation that allegedly causes that imbalance." *Coalition*, 977 F. Supp. 2d at 523 (citation omitted); *see also Ayers v. Fordice*, 111 F.3d 1183, 1223 (5th Cir. 1997) ("The district court correctly focused on the traceability of policies and practices that result in funding disparities rather than the traceability of the disparities themselves."). On this first prong, the "burden of proof lies with the [plaintiff]." *Denton II*, 2026 WL 1660092, at *10 (citing *Knight*, 14 F.3d at 1540–41).

However, if the plaintiff succeeds on this first prong, "the burden of proof shifts to the state 'to establish that it has dismantled its prior de jure segregated system.'" *Coalition*, 977 F. Supp. 2d at 523 (quoting *Fordice*, 505 U.S. at 739). This can be accomplished in one of two ways. *Denton II*, 2026 WL 1660092, at *10 (citation omitted). First, the state "can show that the challenged policy doesn't have any segregative effects today." *Id.* "Policies with segregative effects are those that 'discourage[] or prevent[] blacks from attending'" historically white institutions, and those that "'discourage whites from seeking to attend'" HBCUs. *Coalition*, 977 F. Supp. 2d at 523 (quoting *Knight*, 14 F.3d at 1541). In considering whether a policy has such segregative effects, courts must "consider the effect of the policy as it operates *in combination* with any other challenged policies." *Denton II*, 2026 WL 1660092, at *10 (quoting *Knight*, 14 F.3d at 1541) (emphasis added in *Denton II*). Alternatively, "the state can show that 'it simply is not possible' to abolish or modify the challenged policy." *Id.* (quoting *Knight*, 14 F.3d at 1541). Again, at this second prong, the burden of proof lies with the defendants. *Id.* (citations omitted).

Next, if the state fails to meet its burden at the second prong, "it must show that [the challenged] policies have a 'sound educational justification' and cannot be 'practicably eliminated.'" *Coalition*, 977 F. Supp. 2d at 523 (quoting *Fordice*, 505 U.S. at 731). A state can

show that a policy cannot be practicably eliminated if its "legitimate educational objectives" cannot be accomplished through "less segregative means." *Id.* Thus, at this third step in the *Fordice* analysis, courts consider "the practicability and educational soundness of possible alternatives or modifications to a challenged policy." *Denton II*, 2026 WL 1660092, at \*11 (quoting *Knight*, 14 F.3d at 1541) (internal quotation marks omitted). To be clear, however, "the mere fact that a policy is educationally sound is not enough." *Id.* Indeed, "a state can be required to change even educationally sound practices where they have been found to be vestiges of segregation with continuing segregative effects." *Id.* (quoting *Knight*, 14 F.3d at 1546). "Only where there are no alternative remedies that are practicable *and* educationally sound is the state defendant relieved of its obligation to remedy the vestiges' effects." *Id.* (quoting *Knight*, 14 F.3d at 1546) (emphasis added in *Denton II*).

Since the Supreme Court established this three-prong test in *Fordice*, a handful of courts have examined and applied the test in similar cases concerning HBCUs. While those cases were decided at different procedural postures (e.g., a motion to dismiss or after a bench trial on the merits), they nevertheless inform the Court as to Plaintiffs' ability to demonstrate a likelihood of success on the merits under Rule 65. For example, Plaintiffs cite *Coalition* out of the District of Maryland. *See* [R. 2, p. 15]. In that case, an organization comprised of current and former students of a Maryland HBCU alleged that the state of Maryland had failed to eradicate the vestiges of its earlier era of de jure segregation, thereby violating Title VI and the Equal Protection Clause. *Coalition*, 977 F. Supp. 2d at 519. In considering these claims (after a six-week bench trial), the district court first found that Maryland's HBCUs were racially identifiable. *Id.* at 521–22. The court went on to consider whether the "existing racial identifiability [was] attributable to the State." *Id.* at 521 (quoting *Fordice*, 505 U.S. at 728) (internal quotation marks omitted). In other words,

- 20 -

the district court considered whether the state had "le[ft] in place policies rooted in its prior officially segregated system that serve[d] to maintain the racial identifiability of its universities." *Id.* at 522 (quoting *Fordice*, 505 U.S. at 743) (internal quotation marks omitted).

To answer this question, the district court considered the three allegedly traceable policies identified by those plaintiffs: "(1) limited institutional missions; (2) operational funding deficiencies; and (3) unnecessary program duplication." *Id.* at 523. Regarding the "limited institutional missions," the plaintiffs argued that the Marlyand HBCUs' missions were limited by the state, just as they were during the de jure era. *Id.* at 524. Specifically, the plaintiffs pointed to the state's ultimate approval of any changes to the HBCUs' mission statements; the "actual offerings" of the HBCUs, which the plaintiffs argued were limited in comparison to other predominately white universities and as a result, the missions of the HBCUs were "functionally limited"; and the expansion of the missions of those predominately white universities. *Id.* The district court examined each allegedly traceable policy and found that none "demonstrate[d] that the State's current policies and practices regarding [HBCU] missions are traceable to the de jure era." *Id.*

For example, the district court found that the state's limited involvement in approving the mission statement of each institution did not "demonstrate that the State's mission statement policies and practices are rooted in or a continuation of the mission planning process that limited [HBCUs] during the de jure era." *Id.* at 525. And even assuming the HBCUs' missions were "functionally limited" based on their actual course offerings and capacity, the plaintiffs had failed to demonstrate that those alleged limitations were the product of a state policy or practice controlling the HBCUs' missions, "even if the [HBCUs] 'do' less than [traditionally white institutions]." *Id.* at 526.

The *Coalition* court also found that the plaintiff's funding-related arguments failed. In doing so, the district court first examined the Fifth Circuit's decision in *Ayers v. Fordice*. *See Coalition*, 977 F. Supp. 2d at 529. In that case, during remand proceedings after the Supreme Court's decision in *Fordice*, the Fifth Circuit "[e]mphasiz[ed] the distinction between traceable *policies*" and the continuing discriminatory *effects* of a prior de jure system. *Id.* (citing *Ayers*, 111 F.3d at 1221–24) (emphasis added). The Fifth Circuit went on to explain that the state's funding formula was not a traceable policy because it was "sufficiently disconnected" from the state's prior "mission-based funding policies." *Id.* In other words, while the state's previous funding formula allocated funds based on mission designations, the current formula "allocates funds as a function of the size of each institution's enrollment, faculty, and physical plant." *Id.* (quoting *Ayers*, 111 F.3d at 1224). And importantly,

> [w]hile the formula responds to conditions that to a significant degree have resulted from the mission designations (and consequently results in the [traditionally white institutions] receiving a greater proportion of funds), the manner in which the formula does so is guided by valid educational concerns and is not linked to any prior discriminatory practice.

*Id.* (quoting *Ayers*, 111 F.3d at 1224). Thus, the Fifth Circuit ultimately found that, "despite a resource disparity that flowed from the de jure era, Mississippi's funding formula was not itself a traceable policy." *Id.* (citing *Ayers*, 111 F.3d at 1221–24).

On the other hand, the district court in *Knight v. Alabama*, 900 F. Supp. 272 (N.D. Ala. 1995) found that Alabama's funding formula *was* "an extension of its past funding practices." *Coalition*, 977 F. Supp. 2d at 529. In that case, the state's HBCUs were "discriminatorily underfunded" during the de jure era when compared to historically white institutions. *Knight*, 900 F. Supp. at 308 (citing to its previous findings in *Knight*, 787 F. Supp. at 1271). The state's post-de-jure-era funding formula likewise "favor[ed] institutions with historically higher expenditure

curricula," providing those institutions with an "extraordinary" advantage. *Id.* at 309 (citing to its previous findings in *Knight*, 787 F. Supp. at 1207–08). Moreover, and perhaps more importantly, "the same elements of the funding formula that harmed [HBCUs] during the de jure era had never been addressed." *Coalition*, 977 F. Supp. 2d at 529 (citing *Knight*, 900 F. Supp. at 309); *see also id.* at 529 n.7 (discussing *Knight*).

Having examined *Ayers* and *Knight*, the *Coalition* court concluded that "a state's funding formula is a traceable policy only if it is rooted in or a continuation of the funding practices that disadvantaged [HBCUs] during the de jure era." *Id.* at 529–30. The district court then considered Maryland's funding formula and the funding of HBCUs. *Id.* at 530–32. Notably, it found that under the state's then-current funding formula, Maryland's HBCUs were not underfunded by the state, relative to historically white institutions. *Id.* at 532. And while the formula "arguably [took] mission and programs, which are linked to an institution's history, into account, . . . the funding formula [was] neither based in nor derived from Maryland's de jure era funding practices." *Id.* Instead, the then-current funding formula, which utilized peer-based guidelines, "involve[d] a recently developed target-setting process, and it expressly account[ed] for the unique characteristics of Maryland's [HBCUs] to ensure that peer groups for the [HBCUs] are not limited to other [HBCUs]." *Id.*; *see also id.* at 530 (explaining Maryland's funding formula in detail). Simply put, the plaintiff had failed to provide any "evidence linking the current funding formula to de jure policies and practices." *Id.* at 533. The plaintiff's funding-based arguments therefore failed.[9]

---

[9] The *Coalition* court ultimately found for the plaintiffs on their program duplication arguments. As to those claims, the Court found that, after the de jure era, the state had continued to engage in unnecessary duplication of academic programs, "and there [was] not meaningful program uniqueness at" both HBCUs and non-HBCUs. *Coalition*, 977 F. Supp. 2d at 535–37. Importantly, the record contained "significant evidence" that the program duplication was "a direct result of a continuing failure of the State to address the de jure era policy of duplicating programs to maintain a dual, segregated system." *Id.* at 537. In the present case, Plaintiffs do not rely on any such program duplication allegations to support their claims.

The Court again acknowledges these cases, including *Fordice*, *Coalition*, *Ayers*, and *Knight*, were decided at different procedural stages, under different legal standards (e.g., after a full bench trial on the merits). Nevertheless, for purposes of the present motion, these cases inform the Court as to what facts must ultimately be proven to succeed on Plaintiffs' claims under *Fordice*'s three-prong test.

### b.  Plaintiffs' *Fordice* Theories

With this law in mind, the Court considers Plaintiffs' *Fordice* claims, namely, their Title VI claim and first Equal Protection Clause claim (Counts I and II). As to these specific claims, the Court understands that Plaintiffs rely primarily on the following alleged policies or practices that they claim are linked to SB 185: underfunding; mission narrowing; and programming or curricular changes. In support of each, Plaintiffs argue that Kentucky has a long history of underfunding KSU and this underfunding ultimately resulted in KSU's current financial crisis and "sensitive accreditation posture," which in turn were the catalysts for SB 185. *See, e.g.*, [R. 2, pp. 2, 8–9, 10]. They also allege that SB 185 unlawfully narrows KSU's mission and programming. *See, e.g.*, *id.* at 15.

For support, Plaintiffs cite to various documents in the record, including Kentucky's 1981 plan (developed in collaboration with OCR), its 1990 and 1997 plans, the 2000 Partnership Agreement, the 2009 Report, and the 2023 Letter. *See, e.g.*, *id.* at 3, 6–9; [R. 1, ¶¶ 66–108]. In particular, they point to Kentucky's commitments in the Partnership Agreement, specifically Commitment A.2.c. *See* [R. 1-4, pp. 11–12]. Under that commitment, CPE agreed to "ensure that any change in the funding formula will not disadvantage KSU, and will take into account the institution's status as the Commonwealth's historically black university, and its unique mission as the Commonwealth's small, liberal arts university." *Id.* at 11. But, Plaintiffs argue, SB 185 burdens

- 24 -

these same areas that Kentucky agreed to preserve and enhance, including KSU's mission, and those same issues were at the core of *Fordice*. [R. 2, pp. 5, 15]. Thus, Plaintiffs insist, they have pled "classic" *Fordice* claims. *Id.* at 14.

At this stage, the Court makes no ruling as to the ultimate merits of these or any other claims. It considers only whether Plaintiffs have satisfied their burden of demonstrating a likelihood of success on the merits under Rule 65 and the relevant case law. To do so, Plaintiffs must point to an allegedly segregative policy that is "'traceable' to decisions that were made or practices that were instituted in the past for segregative reasons, thus rendering it a vestige of segregation." *Coalition*, 977 F. Supp. 2d at 523 (citing *Knight*, 14 F.3d at 1540). On this point, the Court acknowledges—and the parties do not and cannot deny—Kentucky's past era of de jure segregation. As other courts have framed it, Kentucky, like many other states, "had a shameful history of de jure segregation throughout much of the past century." *Id.* at 511. And the parties do not appear to dispute that, in 1981, the OCR put Kentucky on notice that "it was operating a racially segregated system of higher education in violation of Title VI of the Civil Rights Act of 1964." [R. 1-4, p. 4]. The current record reflects Kentucky's decades-long efforts to remedy that violation, and indeed, the OCR announced in 2009 that Kentucky was "in compliance with Title VI." *See* [R. 1-4, p. 1 (Cover Letter to 2009 Report)]. Now, the question before the Court is whether, on the current record, Plaintiffs are likely to identify a segregative policy or practice that can be traced to "decisions that were made or practices that were instituted" in Kentucky's de jure era. *Coalition*, 977 F. Supp. 2d at 523 (citing *Knight*, 14 F.3d at 1540). For the reasons set forth below, the Court finds that Plaintiffs have not satisfied the traceability prong as to any of their *Fordice* theories.

### i.  Alleged Underfunding

As an initial matter, the Court notes that SB 185 does not impose any change to KSU's

funding, and Plaintiffs do not argue that it does. Instead, as noted, Plaintiffs' underfunding theory rests on their argument that Kentucky's past de jure segregation resulted in decades of underfunding, which in turn caused KSU's current financial crisis and accreditation concerns, which ultimately drove the passage of SB 185.

First, while Plaintiffs allege that KSU has endured decades of underfunding, the record is unclear on this issue. For instance, Plaintiffs rely on the 2023 Letter to Kentucky's governor from the U.S. Department of Education and U.S. Department of Agriculture. *See, e.g.*, [R. 2, pp. 14–15]; [R. 1-5 (2023 Letter)]. However, without a developed record, it is unclear how much weight the Court should give the letter (or other documents in the record, like OCR's 2009 Report). *See Denton II*, 2026 WL 1660092, at *16; *see generally Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024). Regardless, even taking the letter (and the 2009 Report) at face value, they fail to provide clear details regarding the existence and extent of the alleged underfunding.

As already explained, the 2023 Letter asserts that "[u]nequitable funding of [KSU] has caused a severe financial gap," and "in the last 30 years alone, an additional $172,135,168 would have been available for the university." *Id.* at 2. But the roughly two-page letter provides little information. It states that its writers, the U.S. Department of Education and the U.S. Department of Agriculture, used "readily available data from the National Center for Education Statistics (NCES) Integrated Postsecondary Education Survey (IPEDS) that ranges from 1987 to 2020," but it does not provide that data. *Id.* And it states that its writers "calculated the amount that [HBCUs] would have received if their state funding per student were equal to that of 1862 institutions," referring to those institutions established through the first Morrill Act. *Id.* But it provides no further information on what funding methods were used, what "funding per student" means in this context, whether any comparisons were made to similar universities (in size, curriculum, or otherwise), or

any other relevant factors.

Moreover, Plaintiffs also rely on and attach to their complaint the 2009 Report from OCR, [R. 1-4], yet they ignore its findings. That report details the Commonwealth's funding process for its postsecondary institutions and the various funding methods that have been utilized over the last few decades. *Id.* at 11–12. For example, in both 2001 and 2002 (which fall within the timeframe referenced in the 2023 Letter), "CPE concluded that KSU was funded at a higher rate per full time equivalent (FTE) student than any of the state's other comprehensive universities," including Murray State University, Morehead State University, Northern Kentucky University, Eastern Kentucky University, and Western Kentucky University. *Id.* Ultimately, OCR's review "confirmed that KSU has received more total public funding per FTE student from 1999–[2000] to 2007–08 than any of the Commonwealth's five other comprehensive universities." *Id.* at 12. This funding "resulted from careful attention to the impact of the Commonwealths' budget processes on KSU's funding levels." *Id.*

Plaintiffs do not address these findings. And again, the 2023 Letter, on its face, provides little insight, as it does not discuss funding methods, comparisons with similar universities, or any other factors considered in the detailed 2009 Report, nor does it in any way challenge or dispute the findings in the 2009 Report. As already explained, the 2009 Report found, among other things, that Kentucky was in full compliance with Title VI. [R. 1-4, p. 1 (Cover Letter to the 2009 Report)]. Put simply, given the contrast between the contents and findings of the 2009 Report and the 2023 Letter, Plaintiffs have failed to provide important details (and clarity) regarding their claims of underfunding.

Moreover, Plaintiffs acknowledge that KSU was already in a "sensitive accreditation posture" even before the passage of SB 185. [R. 2, p. 10]; *see also id.* at 16 ("KSU is in a sensitive

SACSCOC posture."). As Plaintiffs themselves point out, KSU was placed on "Warning" status in 2023 by its accrediting body, the Southern Association of Colleges and Schools Commission on Colleges ("SACSCOC"), after SACSCOC identified noncompliance with sixteen standards, including governance, financial resources, CEO control, fiscal control, and other "core requirements." *Id.* at 10. Defendants explain that KSU was only updated to "Probation for Good Cause" in 2025 because state officials stepped in to restructure KSU's leadership team in an effort to stabilize operations and strengthen controls. [R. 23, p. 3]. They contend that SB 185 "is the result of the General Assembly's collaboration with KSU and state education officials to assist KSU in avoiding further turmoil." *Id.* Simply put, on this current, undeveloped record, the link between "decades of underfunding" and SB 185, as argued by Plaintiffs, is unclear.

Furthermore, even assuming an imbalance in resources and funding, Plaintiffs have failed to satisfy *Fordice*'s first prong, i.e., that any such alleged underfunding is traceable to de jure segregation. *Coalition*, 977 F. Supp. 2d at 523 (explaining that it is not sufficient for the plaintiffs to show "a present imbalance in resources without identifying a current policy or practice rooted in de jure segregation that allegedly causes that imbalance"). The law is clear that Plaintiffs bear the burden of proof on this first prong. *Denton II*, 2026 WL 1660092, at *10. But here, Plaintiffs have failed to provide any details from which the Court could trace the alleged underfunding to prior policies or practices rooted in the de jure era. That is, Plaintiffs fail to trace the alleged underfunding generally *or* the specifics of SB 185 to particular policies and practices of the de jure era.

Plaintiffs also fail to engage with relevant case law. They reference "[c]omparable HBCU desegregation litigation" out of Maryland (*Coalition*), Alabama (*Knight*), Tennessee (*Geier v. Sundquist*, which ended in a consent decree), and, of course, Mississippi (*Fordice*). *See, e.g.*, [R. 2,

pp. 4, 15]. But they fail to discuss these cases in any detail or explain how they support Plaintiffs' arguments. Nevertheless, the Court has reviewed these and other cases (like *Ayers, Denton I*, and *Denton II*) and finds that they only further demonstrate that Plaintiffs have failed to show a likelihood of success on the merits.

Consider, for instance, *Coalition*. As detailed above, that court emphasized that the plaintiff must show a "particular policy that has been challenged as segregative is 'traceable' to decisions that were made or practices that were instituted in the past for segregative reasons, thus rendering it a vestige of segregation." *Coalition*, 977 F. Supp. 2d at 523 (quoting *Knight*, 14 F.3d at 1540). To further understand this requirement, the *Coalition* court examined the relevant case law. In *Fordice*, for example, the Supreme Court has explained that "such policies are those that are 'derived from,' 'a continuation of,' 'rooted in,' or that 'have as their antecedents,' prior de jure segregation." *Id.* (quoting *Fordice*, 505 U.S. at 734, 738, 743, 740). And in *Ayers*, which followed *Fordice* on remand, the Fifth Circuit "[e]mphasiz[ed] the distinction between traceable *policies*" and the continuing discriminatory *effects* of a prior de jure system. *See Coalition*, 977 F. Supp. 2d at 529. (citing *Ayers*, 111 F.3d at 1221–24) (emphasis added). In that case, as noted above, the state's funding formula was not a traceable policy because it was "sufficiently disconnected" from the state's prior "mission-based funding policies." *Id.* This was true even though there existed "a resource disparity that flowed from the de jure era." *Id.* (citing *Ayers*, 111 F.3d at 1221–24). On the other hand, in *Knight*, Alabama's funding formula *was* "an extension of its past funding practices." *Id.* at 529. Indeed, "the same elements of the funding formula that harmed [HBCUs] during the de jure era had never been addressed." *Id.* (citing *Knight*, 900 F. Supp. at 309). Thus, the *Coalition* court concluded, "a state's funding formula is a traceable policy only if it is rooted in or a continuation of the funding practices that disadvantaged [HBCUs] during the de jure era."

- 29 -

*Id.* at 529–30. In *Coalition*, like in *Ayers*, the state's funding formula was "neither based in nor derived from [the state's] de jure era funding practices." *Id.* at 532.

Simply put, these cases make clear that it is insufficient to simply point to a disparity in funding or resources. *Coalition*, perhaps, sums it up best:

> While it is not sufficient for the defendants simply to show that current policies are race neutral, neither is it sufficient for the plaintiffs to show, for example, a present imbalance in resources without identifying a current policy or practice rooted in de jure segregation that allegedly causes that imbalance.

*Id.* at 523.

But that is exactly what Plaintiffs have done in this case. This falls far short of the requirement that Plaintiffs point to a segregative policy that "is 'traceable' to decisions that were made or practices that were instituted in the past for segregative reasons." *Coalition*, 977 F. Supp. 2d at 523 (quoting *Knight*, 14 F.3d at 1540). Indeed, the record and the briefing in this case fail to give the Court enough information to fulsomely undertake the *Fordice* analysis, as applied in recent cases like *Coalition* and *Denton II*, much less to find a likelihood of success on the merits of that analysis. For instance, Plaintiffs point to the alleged imbalance of funds cited in the 2023 Letter, but they fail to address the OCR's findings in the 2009 Report, and they in no way attempt to reconcile those findings with the statements in the 2023 Letter. Moreover, they fail to identify what funding formulas or factors were employed during the de jure era, and they fail to outline the contours of Kentucky's current funding formula and explain how that funding formula resulted in the $172,135,168 disparity alleged in the 2023 Letter. *See* [R. 1-5, p. 2]. These are just some of the details that are relevant to a *Fordice* traceability analysis, and indeed, far greater details were alleged or supported in *Denton II* (to survive a motion to dismiss) and demonstrated in *Coalition* (to ultimately fail on the merits after a bench trial).

For their part, the defendants largely fail to engage with the *Fordice* analysis. They instead

- 30 -

repeatedly argue that SB 185 is race neutral, they have not made any race-based determinations, they are not applying SB 185 differently depending on a student's race, and they are not eliminating any programs based on race. *See, e.g.*, [R. 24, p. 7]. But that argument wholly fails to consider and engage with the applicable law, namely *Fordice*. Moreover, it fully ignores that it is insufficient for the defendants "simply to show that current policies are race-neutral." *Coalition*, 977 F. Supp. 2d at 523 (citation omitted).

Regardless, for all of the reasons just stated, the Court finds that, on the current record, Plaintiffs have failed to establish a likelihood of succeeding on the first *Fordice* prong: traceability. Stated another way, on the current and limited record before the Court, Plaintiffs have failed to demonstrate that "any current operational funding [related] policy or practice . . . is traceable to the de jure era, even if [KSU] do[es] not have resources . . . equal to" Kentucky's historically white institutions. *Coalition*, 977 F. Supp. 2d at 524; *see also id.* at 523 (explaining that it is not sufficient for the plaintiffs to show "a present imbalance in resources without identifying a current policy or practice rooted in de jure segregation that allegedly causes that imbalance"). Plaintiffs have therefore failed to meet their burden of demonstrating a likelihood of success on their *Fordice* claims, to the extent they rely on the alleged underfunding of KSU.

### ii.  Alleged Mission Narrowing and Programming Changes

The Court next turns to Plaintiffs' arguments concerning the alleged mission narrowing of KSU and the programming changes to KSU, which the Court considers together. As to these issues, Plaintiffs broadly argue that SB 185 "restructures the very mission, funding, programs, faculty capacity, governance, and accreditation-facing functions that federal authorities required Kentucky to protect and enhance." [R. 2, p. 2]. As explained above, Plaintiffs rely on Kentucky's commitments in the Partnership Agreement, specifically Commitment A.2.c, as detailed in the

2009 Report. *See* [R. 1-4, pp. 11–12]. Under that commitment, CPE agreed to, among other things, "take into account [KSU's] status as the Commonwealth's historically black university, and its unique mission as the Commonwealth's small, liberal arts university" when making changes to its funding formula. *Id.* at 11. But, Plaintiffs argue, SB 185 "threatens to redefine and narrow" KSU's "land-grant mission and HBCU identity," as well as its mission as a small liberal arts university. [R. 2, pp. 3–4, 9, 15, 22 (discussing irreparable harm)]. From the best the Court can tell, Plaintiffs refer, at least in part, to SB 185's characterization of KSU as a "four (4) year residential polytechnic institution." *See* [R. 1-6, p. 1].

In considering this argument, the Court compared the current version of KRS § 164.290, as amended by SB 185, to the prior version that was previously amended in 1992 (although the language regarding KSU's status as an institution "emphasizing a program of liberal studies" appears to have been added for the first time in 1982). In that most recent version of the statute (as amended in 1992), subsection 1 stated that certain state colleges (e.g., Kentucky State College) "may be known and recognized" as universities (e.g., Kentucky State University). *See* KRS § 164.290(1) (amended 2026). Subsection 2 of the statute then stated,

> Kentucky State University located at Frankfort, Kentucky, is a land-grant state institution and, as such, all the provisions of KRS Chapter 164 shall likewise apply to Kentucky State University. It is the intent of the General Assembly that Kentucky State University shall serve as a four (4) year residential institution emphasizing a program of liberal studies appropriate to its size and resources.

KRS § 164.290(2) (amended 2026). SB 185 removes subsection 2 from KRS § 164.290. *See* [R. 1-6, p. 7]; KRS § 164.290. Importantly, however, it adds a new section to KRS Chapter 164 that reads, in relevant part, as follows:

> Kentucky State University, recognized as an 1890 land-grant university that is Kentucky's only public Historically Black College or University (HBCU), shall be a four (4) year residential polytechnic institution that focuses on highly technical, industry-based applied learning and offers liberal studies and polytechnic programs

- 32 -

that are aligned with the workforce needs of the Commonwealth and consistent with the historical mission of an HBCU.

*See* [R. 1-6, pp. 2–3].

The statutes are similar in some ways. For example, both the prior version of KRS § 164.290 and the new statute identify KSU as a land-grant institution. And both identify KSU as a four-year residential institution. But there are differences, too. The prior version of KRS § 164.290 referenced the General Assembly's intent that KSU "[e]mphasiz[e] a program of liberal studies appropriate to its size and resources." *See* KRS § 164.290(2) (amended 2026). The new statute, created by SB 185, defines KSU as a four-year residential "*polytechnic* institution that focuses on highly technical, industry-based applied learning and offers liberal studies and polytechnic programs that are aligned with the workforce needs of the Commonwealth and consistent with the historical mission of an HBCU." *See* [R. 1-6, p. 1 (emphasis added)]. The new statute also recognizes KSU as Kentucky's only HBCU, *id.*, while the prior version of KRS § 164.290 made no reference to KSU's HBCU identity. *See* KRS § 164.290(2) (amended 2026). And to the extent the new version requires KSU to "offer[] liberal studies and polytechnic programs that are aligned with the workforce needs of the Commonwealth," it also requires that they be aligned with "the historical mission of an HBCU." *See* [R. 1-6, p. 1].

Regarding the language of the statutes, Plaintiffs insist that "a label does not preserve a mission," [R. 26, p. 13], and this is a fair point. However, they point to no express provision in the statute that diminishes or limits KSU's status or mission as a land-grant university and HBCU. That is, it is unclear whether SB 185 "threatens to redefine and narrow" KSU's "land-grant mission and HBCU identity," though it certainly changes the programmatic mission focus from "a four (4) year residential institution emphasizing a program of liberal studies" to "a four (4) year residential polytechnic institution that focuses on highly technical, industry-based applied learning and offers

- 33 -

liberal studies and polytechnic programs." *See* [R. 1-6, p. 1]. Per the statute, such programming must align with KSU's historical mission as an HBCU.

To the extent the plaintiffs rely on the above changes and the associated statutory requirements related to academic area caps and program closures, the Court understands their argument to be that KSU is "functionally limited in mission" based on the new program emphasis and these requirements. *See generally Coalition*, 977 F. Supp. 2d at 525–26. But on the current record, it remains unclear how significant the program changes will be. While KSU must limit the number of academic areas of study and must recommend program closures, *see* [R. 1-6, pp. 2–3], SB 185 does not itself eliminate any specific area of study, nor does it require KSU to close specific programs; those selections instead lie with KSU, CPE, and ultimately, SACSCOC.[10] *Id.* at 3. But even assuming that this statutory change narrows KSU's mission and programming, as argued by Plaintiffs, they have failed, on the current record, to demonstrate that they are likely to satisfy their burden under *Fordice*'s traceability prong, for the reasons explained below.

On this traceability issue, the *Coalition* case is again instructive. Notably, that court found that, "[i]f the State *continues* to impose more 'limited' missions on public [HBCUs] than their [traditionally white] counterparts, such mission designations may be traceable policies." *Coalition*, 977 F. Supp. 2d at 524 (citations omitted) (emphasis added). In other words, if the state adopts a limited mission designation that effectively fixes the scope of an HBCU's program offerings to that which was in place during the de jure era, that mission limitation is likely traceable to the de jure era. *Id.*; *see also Knight*, 14 F.3d at 1544. But that was not the case in *Coalition*. Instead, the court found that,

---

[10] In their June 6, 2026 filing, the Commonwealth Defendants and KSU Defendants advised that the following programs would be closed, with a teach-out plan effective July 1, 2026: Bachelor of Music Education, Bachelor of Music Performance, Bachelor of Arts in Political Science, Bachelor of Arts in Child Development & Family Studies. *See* [R. 35]; [R. 35-1].

- 34 -

> while the mission statements of Maryland's [HBCUs] are in some ways historically linked to their de jure era analogs, the Coalition has not demonstrated that the State continues to "effectively fix" the scope of [HBCU] offerings based on their de jure era missions, nor does it continue to impose missions on the [HBCUs], which have independence and flexibility in crafting mission statements.

*Coalition*, 977 F. Supp. 2d at 524.

Notably, the *Coalition* court made this finding after a lengthy bench trial, during which the parties presented extensive evidence and testimony (including expert testimony) regarding the state's policies on mission statements, the state's efforts to expand the roles of HBCUs, the missions of the state's traditionally white institutions, and so on. *See generally id.* at 524–29. Even with this extensive evidence in the record, the plaintiffs in *Coalition* still failed on their mission-related arguments. *See id.* And in *Denton II*, the plaintiffs' complaint survived a motion to dismiss after the appellate court considered its extensive and detailed allegations. *See generally Denton II*, 2026 WL 1660092. Such detailed allegations are lacking on the current record.

Again, the Court credits Plaintiffs' argument that SB 185 shifts KSU's mission from "a four [4] year residential institution emphasizing a program of liberal studies appropriate to its size and resources" to "a four [4] year residential polytechnic institution that focuses on highly technical, industry-based applied learning and offers liberal studies and polytechnic programs that are aligned with the workforce needs of the Commonwealth and consistent with the historical mission of an HBCU", and that it anticipates some program closures. However, it is important to note that KSU was involved in that decision and provided input, a fact that Plaintiffs do not dispute. *See, e.g.*, [R. 24, p. 2]. But more importantly, Plaintiffs have wholly failed to demonstrate that any mission and programming changes are in any way "rooted in or a continuation of the mission planning process that limited [KSU] during the de jure era." *Coalition*, 977 F. Supp. 2d at 525. Indeed, they fail to explain what KSU's mission (or programming) looked like in the de jure era,

- 35 -

or how the current mission or programming, as outlined in SB 185, is rooted in any prior de jure segregative policies. To the extent they allege that KSU's mission as a small liberal arts university is being narrowed or weakened, they have failed to articulate when KSU first attained that mission (e.g., was it during the de jure era). Indeed, it appears that the language defining KSU as "a four (4) year residential institution emphasizing a program of liberal studies" was not added to KRS § 164.290 until 1982. *See* S.B. 77 (Ky. 1982). Accordingly, without more information, the Court cannot find that Plaintiffs are likely to succeed on the merits of their *Fordice* claims, to the extent they rely on the allegations of mission narrowing and program changing.

In sum, the plaintiffs have "not proven that any current operational funding or mission [or program] related policy or practice . . . is traceable to the de jure era, even if [KSU] do[es] not have resources or missions equal to" Kentucky's historically white institutions. *Coalition*, 977 F. Supp. 2d at 524. Thus, Plaintiffs have failed at this stage to meet their burden of demonstrating a likelihood of success on their *Fordice* claims (and more specifically, the traceability prong). Again, the Court is not making a final merits ruling on these claims. Instead, the sole and narrow question before this Court is whether Plaintiffs have met the high burden required for a temporary restraining order. For the reasons set forth above, the Court finds that Plaintiffs have failed to satisfy their burden of demonstrating a likelihood of success on the merits of their *Fordice* claims.

### 2.  Plaintiffs' *Arlington Heights* Claim (Count III)

Importantly, to establish a constitutional violation (i.e., an Equal Protection Clause violation) under *Fordice*, a plaintiff will not "always have to show discriminatory intent." *Denton II*, 2026 WL 1660092, at *9 (citation omitted). If the plaintiff can show that the state has "'perpetuat[ed] . . . policies traceable to the prior de jure segregative regime which have continuing discriminatory effects,' then the plaintiff 'need not show such discriminatory intent.'" *Id.* (quoting

- 36 -

*Fordice*, 505 U.S. at 733 n.8). However, "if the plaintiff identifies 'present policies that *do not* have such historical antecedents,' then they do have to show a 'discriminatory purpose.'" *Id.* (quoting *Fordice*, 505 U.S. at 733 n.8) (emphasis added in *Denton II*).

Stated another way, Plaintiffs may raise a Fourteenth Amendment Equal Protection Clause claim separate and apart from *Fordice*. *See Denton I*, 713 F. Supp. 3d at 1215 ("Separate and apart from *Fordice*, the Fourteenth Amendment prohibits intentional racial discrimination in public education, without any requirement for a nexus to past de jure segregation."). That is, Plaintiffs may demonstrate intentional race discrimination (i.e., discriminatory intent) "without any requirement for a nexus to past de jure segregation." *Id.* From the Court's understanding of the complaint and the briefing, Plaintiffs argue that they are likely to succeed on their second Equal Protection Clause claim (Count III) separate and apart from *Fordice*. *See* [R. 1, ¶¶ 340–52]; [R. 2, p. 15 ("Even apart from *Fordice*, Plaintiffs are likely to succeed under *Arlington Heights*.")].

To show the required discriminatory intent, Plaintiffs rely on *Arlington Heights*. *See* [R. 1, ¶¶ 340–52]; [R. 2, pp. 13–14, 15–16]; [R. 27, pp. 6–7]. In *Arlington Heights*, the Supreme Court "identified factors relevant to establishing a circumstantial inference of discriminatory animus." *Coal. for Advancement of Reg' Transp.*, 576 F. App'x at 493. The Sixth Circuit has summarized these factors as follows.

> First, disparate racial impact may be a "starting point," but "impact alone is not determinative." Second, the "historical background of the decision" may be relevant, "if it reveals a series of official actions taken for invidious purposes." Third, the "sequence of events leading up [to] the challenged decision also may shed some light on the decisionmaker's purposes." Fourth, "[d]epartures from the normal procedural sequence also might afford evidence that improper purposes are playing a role." Fifth, departures from established "substantive" standards "may be relevant, particularly if the factors usually considered important by the decisionmaker strongly favor" a different course of action than the one selected. Finally, the "legislative or administrative history may be highly relevant," including "statements by members of the decisionmaking body, minutes of its meetings, or reports."

*Id.* at 493–94 (internal citations omitted). These factors "are one way of showing discriminatory intent," but "they are just 'some examples' of the kinds of 'evidence that courts might properly consider' in undertaking this inquiry." *Denton II*, 2026 WL 1660092, at \*19 (quoting *Elston v. Talladega Cnty. Bd. of Educ.*, 997 F.2d 1394, 1406 (11th Cir. 1993)) (citation modified). In other words, this is not an exhaustive list and, indeed, "the factors have since been supplemented by the 'foreseeability of discriminatory impact, . . . knowledge of discriminatory impact, . . . and . . . the availability of less discriminatory alternatives." *Id.* (quoting *Jean v. Nelson*, 711 F.2d 1455, 1486 (11th Cir. 1983)).

Regardless, to the extent Plaintiffs rely on the *Arlington Heights* or related factors, they fail to fully discuss and engage with those factors. Indeed, Plaintiffs expend no more than a few sentences on these factors and fail to cite to any authority beyond merely citing *Arlington Heights*. *See* [R. 2, pp. 13–14, 15–16]. Moreover, for many of the same reasons that Plaintiffs' *Fordice* claims are unlikely to succeed on the current record, the factors relevant to Plaintiffs' *Arlington Heights* claim are likewise undeveloped and unlikely to succeed. Thus, on the current limited record, and with a lack of developed argument from Plaintiffs, the Court cannot say that Plaintiffs are likely to succeed on their Equal Protection Clause claim (Count III), to the extent they rely on *Arlington Heights*.[11]

Moreover, the Court has reviewed the detailed and extensive allegations of the plaintiffs' complaint in *Denton II*, which the Eleventh Circuit found "support[ed] the reasonable inference that discriminatory motivations were at play." *Denton II*, 20206 WL 1660092, at \*20. As such, the *Denton II* plaintiffs' Equal Protection Clause claim (i.e., a claim of intentional discrimination)

---

[11] Plaintiffs' briefing also references *Arlington Heights* when discussing Count I, their Title VI claim. [R. 2, p. 13]. However, to the extent they rely on *Arlington Heights* to support that claim, they have likewise failed to demonstrate a likelihood of success on the merits, for the reasons just stated.

survived the defendants' motion to dismiss. *See generally id.* at 19–21. Of course, that court applied the much lower pleading standard applicable to such motions, whereas in this case, the plaintiffs move for a temporary restraining order, and they must therefore meet a higher standard to demonstrate a likelihood of success on the merits of their claims. But Plaintiffs' undeveloped arguments stand in start contrast to the detailed allegations outlined in *Denton II*. The Court therefore finds it unlikely that, on the current record, they could succeed on their *Arlington Heights* claim (Count III).

The Court again notes that temporary restraining orders are "extraordinary and drastic remed[ies]" that are "never awarded as of right," and instead they impose a "high" standard. *N.R.*, 2022 WL 837724, at *2. In this case, Plaintiffs, as the party seeking a temporary restraining order, bear the burden of "making a 'clear showing'" that they are entitled to such extraordinary relief. *Rayford*, 2026 WL 1262970, at *3. As already explained, the Court finds that, on the limited record before it, the plaintiffs have failed to satisfy their burden of demonstrating a likelihood of success on the merits of their Title VI or Equal Protection Clause claims (Counts I–III). Regardless, for the reasons that follow, the Court finds that, even assuming Plaintiffs satisfied their burden of demonstrating a likelihood of success on the merits, they have failed to demonstrate irreparable harm for purposes of the requested temporary restraining order.

### C.  Irreparable Harm

As the Sixth Circuit has explained, "[i]rreparable harm occurs when a party has no adequate remedy at law, typically because its injuries cannot be fully compensated by money damages." *Owensboro Specialty Polymers, Inc. v. Daramic, LLC*, No. 4:20-CV-163-JHM, 2020 WL 13577473, at *1 (W.D. Ky. Sep. 25, 2020) (citing *Basicomputer Corp. v. Scott*, 973 F.2d 507, 511

(6th Cir. 1992)). Thus, an alleged harm is typically "not irreparable if it is fully compensable by money damages."

Because Plaintiffs must show that they will suffer actual and imminent harm "in the absence of injunctive relief," *id.*, the Court considers the precise relief requested in this case. In the request for a temporary restraining order, Plaintiffs explain that they seek an order that "restrain[s] Defendants from implementing Kentucky [SB 185] in ways that irreversibly alter [KSU] before the Court can adjudicate Plaintiffs' claims." [R. 2, p. 2]. More specifically, they seek a temporary restraining stating that

> Defendants are temporarily restrained from enforcing, implementing, directing, approving, or requiring implementation of SB 185 in any manner that irreversibly or practically irreversibly alters KSU's academic program array, mission, accreditation posture, student access, faculty-student relationships, degree pathways, land-grant functions, or HBCU identity before the Court can hold a preliminary-injunction hearing.

[R. 2-1, p. 5].

Their proposed order would enjoin the defendants from closing or eliminating programs "based on SB 185 program-review, academic area-cap, closure, consolidation, financial-exigency, or polytechnic-mission provisions"; submitting or implementing "any SACSCOC substantive-change request," including teach-out plans, program closures, and other changes "premised on SB 185, except as narrowly necessary to preserve accreditation" or if agreed to by the parties and authorized by the Court; terminating or taking adverse personnel action against faculty, staff, and other employees "based on SB 185 financial-exigency, program-closure, academic-restructuring, or polytechnic-mission authority, except for ordinary-course discipline, resignation, retirement, or personnel actions unrelated to SB 185"; imposing "new KSU-specific" admissions and enrollment criteria "that were not in effect immediately before SB 185 and that would deter, exclude, or burden prospective KSU applicants, admitted students, or current students"; "[b]arring admission,

- 40 -

readmission, continued enrollment, registration, course access, academic progress, or access to transcripts necessary for continued education based on SB 185 debt-related provisions without individualized notice, hardship review, payment-plan procedures, academic-completion safeguards, and further order of this Court"; implementing measures "in a manner that prevents ordinary educational operations, impairs program continuity, interferes with SACSCOC compliance, or effectively deprives KSU's Board, President, accreditation liaison, faculty, or academic leadership of the authority necessary to preserve accreditation and educational continuity." *Id.* at 5–7; *see also* [R. 2, pp. 5–6]. Lastly, the proposed temporary restraining order would prevent the defendants from "[t]aking any action that would make it impracticable to restore KSU's pre-SB 185 academic program array, faculty-student relationships, court sequences, degree pathways, land-grant functions, accreditation position, HBCU mission, or institutional identity if Plaintiffs prevail." [R. 2-1, p. 7]; *see also* [R. 2, p. 6].

In support of this request, the plaintiffs cite to the following harms: "disruption of degree pathways, course availability, faculty mentorship, program continuity, research opportunities, internships, scholarships, support services, accreditation stability, and the value of the education for which they enrolled," for current and prospective students, [R. 2, p. 17]; "immediate deterrence and exclusion," as well as the "the loss of access to Kentucky's only HBCU, Kentucky's 1890 land-grant institution, and the specific educational community and mission that KSU provides," for prospective applicants and admitted students, *id.* at 19; and harm to the "value and meaning of KSU degrees and the alumni community's ability to mentor, recruit, fundraise, and advocate for KSU," for KSU alumni. *Id.* at 20; *see also* [R. 1, ¶¶ 271–88 (identifying the alleged irreparable harms that support Plaintiffs' request for a temporary restraining order)]. The plaintiffs also argue that current students, prospective students, and alumni all "experienced diminished educational

opportunities, reduced academic support, constrained research capacity, reduced course availability, larger advising burdens, faculty turnover, delayed course sequencing, reduced mentorship, and decreased institutional competitiveness." [R. 2, pp. 20–21].

These alleged injuries are quite broad, and in many cases vaguely defined, and there is significant repetition and overlap among the various types of harm listed above. Thus, for purposes of this opinion, the Court finds it helpful to characterize these alleged harms as follows: program-related harms; accreditation-related harms; mission-related harms; uncertainty and instability harms; and degree value harms. The Court considers each category in turn.

### 1. Program-Related Harms

The Court first considers the alleged program-related harms. Under SB 185, KSU's Board of Regents, "in consultation with the [CPE]," are required to review "all academic programs for long-term viability, financial stability, [and] alignment with the university's mission as a polytechnic institution," among other things, and determine which academic programs KSU will maintain and which it recommends for closure. [R. 1-6, pp. 2–3]. SB 185 then outlines a multi-step review and approval process, in which the Board of Regents first obtains input and approval from CPE before ultimately submitting its program-closure proposal to KSU's accrediting body, SACSCOC. *Id.* Importantly, for each program it proposes to close, KSU must also utilize teach-out plans and arrangements. *Id.* at 3. As explained in the briefing, a teach-out plan or arrangement requires KSU to allow current and admitted students already enrolled in any of those closed programs "to take the classes necessary to graduate with a degree in those programs." [R. 23, p. 15, n.11]; *see also* [R. 24, p. 11]. After SACSCOC reviews the proposal, KSU "shall close each program approved for closure by the SACSCOC and implement the corresponding teach-out plan

or teach-out agreement[12] as approved by that accrediting body." [R. 1-6, p. 3].

Plaintiffs now allege that there exists an immediate "programmatic" injury in the "loss of access to the specific KSU program . . . for which a student enrolled." [R. 2, p. 18]. From the best the Court can tell, Plaintiffs argue that the closure of programs disrupts "program continuity" for these students, and such harms cannot be remedied "by a later damages award."[13] *Id.* at 17–18. But they do not allege that any named plaintiff's own academic major or award is being eliminated or that they have been denied enrollment in any such program under SB 185's requirements. Moreover, Plaintiffs' argument overlooks the mandatory teach-out provisions of SB 185. As detailed above, KSU is required to include teach-out plans or arrangements for any program that it seeks to close. [R. 1-6, p. 3]. Accordingly, to the extent Plaintiffs cite to program closures and argue that such closures lead to "loss of access to the specific KSU program . . . for which a student enrolled," [R. 2, p. 18], they have failed to substantiate these allegations on the current record. *See, e.g.*, *Ecolab*, 2023 WL 4365933, at *7 (requiring movant to demonstrate that "they will suffer actual and imminent harm rather than harm that is speculative or unsubstantiated" (quoting *Abney*, 443 F.3d at 552)).

Nevertheless, in their reply brief, Plaintiffs argue that "[t]each-out plans do not cure irreparable injury." [R. 26, p. 12]. According to Plaintiffs, such teach-out plans "do[] not preserve the full program community, faculty mentorship, electives, clinical and research opportunities, program reputation, applicant pipeline, alumni network, or degree value." *Id.* And, they argue, such plans "offer[] no answer for prospective or admitted students who seek entry into the program,

---

[12] SB 185 sometimes refers to these as "teach-out plan[s] or teach-out arrangement[s]," and other times refers to them as "teach-out plan[s] or teach-out agreement[s]." *See* [R. 1-6, p. 3].

[13] To the extent Plaintiffs allege that these program closures may affect KSU's accreditation, the Court addresses that issue below.

for faculty whose positions are destabilized, or for alumni whose degree and institutional mission are affected." *Id.*

On the current record, Plaintiffs have failed to make a "clear showing" of irreparable harm, given the teach-out provisions that apply to both current and admitted students. Plaintiffs fail to articulate any particularized harm that any named plaintiff will suffer, or any program closure for a particular plaintiff that could not be remedied through the required teach-out provisions. *See* [R. 24, p. 9]. And otherwise, their alleged injuries related to such things as "mentorship," "program reputation," and "degree value" do not appear to be "certain and immediate." *Ecolab*, 2023 WL 4365933, at *7. Moreover, Plaintiffs have provided no explanation as why their alleged injuries are so certain and immediate "that relief is necessary before a preliminary injunction hearing can occur." *Id.* (quoting *Touzi Tech LLC*, 2022 WL 127970, at *1) (internal quotation marks omitted); *see also D.T. v. Sumner Cnty. Schs.*, 942 F.3d 324, 327 (6th Cir. 2019).

Accordingly, to the extent Plaintiffs rely on the above-described program-related harms, they have not satisfied their burden of demonstrating "they will suffer actual and imminent harm rather than harm that is speculative or unsubstantiated" in the absence of a temporary restraining order. *Ecolab*, 2023 WL 4365933, at *7 (quoting *Abney*, 443 F.3d at 552). Moreover, to the extent this argument goes to the students' uncertainty in attending KSU or the mission of KSU, those issues are addressed below.

### 2. Accreditation-Related Harms

The Court next considers the alleged accreditation-related harms. On this issue, Plaintiffs note that "KSU is already in a sensitive accreditation posture" after being placed on "Warning" status in 2023 by SACSCOC, before being updated to "Probation for Good Cause" in 2025. [R. 2, p. 10]. To maintain its accreditation, Plaintiffs argue, KSU must comply with SACSCOC's

standards. *Id.* These standards "require[] institutional autonomy, governing-board authority, CEO control, faculty responsibility for curriculum and program quality, and protection from undue external influence." *Id.* But, Plaintiffs argue, SB 185 "gives CPE extraordinary approval authority over KSU expenditures, contracts, personnel actions, admissions, program review, program closures, mission implementation, and financial systems." *Id.* at 10–11. According to Plaintiffs, this creates an "accreditation catch-22" in which KSU is forced to either comply with SB 185 and allow state oversight and control of certain governance and fiduciary matters at the risk of its accreditation status, or maintain "institutional autonomy" and control, thereby satisfying SACSCOC's accreditation standards but violating SB 185. *Id.* at 11 ("If KSU complies with SB 185, it risks being unable to demonstrate the independence and control SACSCOC requires; if KSU resists SB 185 to satisfy SACSCOC, it risks violating state law."). Thus, Plaintiffs argue, "SB 185 threatens accreditation." *Id.* at 21. And this, in turn, leads to irreparable accreditation-related harms because "KSU's accreditation affects federal financial aid, transferability, graduate-school and professional recognition, institutional grants, donor and enrollment confidence, degree value, program viability, and public trust." *Id.*

Again, in evaluating these arguments, the Court must consider whether the plaintiffs would suffer immediate and irreparable harm in the absence of the specific injunctive relief requested, that is, an injunction prohibiting the implementation of SB 185. True, SB 185 does limit KSU to offering "no more than ten (10) academic areas of study," with some exceptions. [R. 1-6, p. 3]. And it requires KSU's Board of Regents, "in consultation with the [CPE]" to review "all academic programs for long-term viability, financial stability, [and] alignment with the university's mission as a polytechnic institution," among other things, and determine which academic programs KSU will maintain and which it recommends for closure. *Id.* at 2–3. The Board of Regents is then

required to submit its proposal to the CPE, which may require additional edits to the proposal before it is then submitted "for the review and approval of SACSCOC." *Id.* at 3. Under the terms of SB 185, KSU is only permitted to close the programs "approved for closure by SACSCOC" and must implement "the corresponding teach-out plan or teach-out agreement as approved" by SACSCOC. *Id.* Thus, SB 185, by its very terms, ensures that KSU will not close any programs that are necessary to maintain its accreditation.

And, importantly, SB 185 clearly and unequivocally states that, notwithstanding its provision on KSU's program limitations, KSU "shall abide by all instructions provided by SACSCOC that are required to maintain institutional accreditation." *Id.* at 4. Given this language, and Plaintiffs' failure to point to any specific SACSCOC standard that conflicts with SB 185, or any specific provision of SB 185 that threatens KSU's accreditation, the Court cannot find that Plaintiffs will suffer the alleged accreditation-related harms in the absence of an injunction prohibiting the implementation of SB 185.

### 3. Mission-Related Harms

The Court next considers the alleged mission-related harms. As to these harms, Plaintiffs argue that SB 185 "threatens to redefine and narrow" KSU's "land-grant mission and HBCU identity." [R. 2, p. 22]. The Court understands that Plaintiffs refer to SB 185's characterization of KSU as a "four (4) year residential polytechnic institution." *See* [R. 1-6, p. 1]. According to Plaintiffs, this mission-related harm will "change[] the character of the institution, the identity of the educational experience, the role KSU plays in Kentucky's public system, and the community KSU serves." *Id.*

However, as the Court has detailed above, *see supra* Section III.B.1.b.ii, it is unclear at this stage whether SB 185 threatens, as Plaintiffs claim, to "redefine and narrow" KSU's "land-grant

mission and HBCU identity," though it appears to change KSU's program mission from one of an "institution emphasizing a program of liberal studies" to a polytechnic institution. Further, as stated previously, it is unclear on this record just how significant and expansive those program changes will be. As such, and given the teach-out provisions and SB 185's requirement that KSU continue to offer liberal studies programming, [R. 1-6, p. 1], Plaintiffs have failed to demonstrate that immediate and irreparable harm will occur in the absence of a temporary restraining order.

### 4. Uncertainty and Instability Harms, Degree Value Harms, and Other Alleged Harms

The Court next considers the remaining alleged harms, which can best be described as "uncertainty and instability" harms and "degree value" harms. Regarding the former, from the best the Court can tell, Plaintiffs allege that they and other students must soon make the decision whether to attend KSU, but they face uncertainty and may ultimately forgo enrollment at KSU due to "faculty instability, accreditation risk, and uncertainty regarding academic continuity." *See, e.g.*, [R. 1, ¶¶ 264, 281, 287]. For example, they argue that prospective and admitted students are faced with the decision to "apply, deposit, enroll, accept scholarships, decline other offers, or attend another institution," and their decisions may be affected by SB 185's effect on "admissions criteria, program availability, in-person academic offerings, institutional mission, faculty capacity, and accreditation risk." [R. 2, p. 19]. Similarly, regarding the alleged degree value harms, Plaintiffs argue that "[p]rogram closures, accreditation sanctions, mission narrowing, faculty capacity loss, applicant deterrence, and reputational injury affect the value and meaning of KSU degrees and the alumni community's ability to mentor, recruit, fundraise, and advocate for KSU." *Id.* at 20.

To the extent this alleged uncertainty, instability, and harm to degree value stems from the alleged program-related, accreditation-related, or mission-related harms, the Court has already discussed those matters above. Put simply, Plaintiffs have failed, on the current record, to

substantiate those harms. That is, for the limited purposes of their request for a temporary restraining order, they have not demonstrated that any such harms are immediate and irreparable, such that emergency injunctive relief is warranted. As such, to the extent Plaintiffs argue that students face uncertainty or instability stemming from such unsubstantiated harms, they have likewise failed to demonstrate that such harms are likely to result from the legislation.

Lastly, in their motion seeking a temporary restraining order, Plaintiffs cite for the first time to certain "due process harm[s]" stemming from SB 185's "debt-related provisions." [R. 2, p. 18]. Devoting a single sentence to these alleged harms, they argue that "[a] current student barred from registration, course access, readmission, transcript access necessary for continued education, or degree progress based on a new debt threshold loses time, academic momentum, financial-aid sequencing, housing and employment arrangements, and progress toward graduation." *Id.* They cite to various paragraphs in their complaint, none of which address these alleged harms. *See id.* (citing [R. 1, ¶¶ 140, 216–18, 387–90)].[14] From the best the Court can tell, Plaintiffs refer to SB 185's provision stating that individuals with an outstanding balance to KSU in excess of $1,000, due and owing for more than sixty days, "shall not be admitted or readmitted to the university or permitted to enroll or continue in any online or in-person course, seminar, or program at the university." [R. 1-6, p. 5]. However, Plaintiffs fail to explain how this provision results in "due process harms." Given that this argument is wholly undeveloped, the Court will not consider it further. *McPherson*, 125 F.3d at 995–96. Moreover, even if considered, the scant record appears contested on these issues. For example, the defendants argue that SB 185's debt-related provisions are no more restrictive (and are, in some cases, less restrictive) than the KSU policies in place prior to SB 185's enactment. [R. 24, p. 12]. They maintain that those policies "provide

---

[14] The Court notes that the Complaint's last numbered paragraph is 370. *See* [R. 1, p. 73]. To the extent Plaintiffs intended to cite paragraphs 287–90, those paragraphs also fail to support Plaintiffs' position.

students with notice and an opportunity to be heard concerning their debt before reenrollment is denied." *Id.*; *see also id.* at 12–13 (discussing KSU's policies); [R. 24-2 (KSU's Student Financial Responsibility and Collections Policy)]; [R. 24-3 (KSU's Student Account Collections Regulation)]; [R. 24-4 (Bursar Affidavit)].

Having considered each of the various categories of alleged harm, the Court finds Plaintiffs have failed to demonstrate that any immediate, concrete, and irreparable harms will occur in the absence of a temporary restraining order. As such, they have failed to demonstrate the irreparable harm necessary to secure the requested injunctive relief. *See Ecolab*, 2023 WL 4365933, at *7 ("[T]to demonstrate irreparable harm, the moving parties must show that, in the absence of injunctive relief, 'they will suffer actual and imminent harm rather than harm that is speculative or unsubstantiated.'" (quoting *Abney*, 443 F.3d at 552) (citation modified)).

IV.   CONCLUSION

For the reasons set forth above, the Court finds that the plaintiffs have failed to demonstrate a likelihood of success on the merits, and they have likewise failed to demonstrate irreparable harm. As such, the Court need not consider in detail the remaining temporary restraining order factors, i.e., the balance of hardships and the public interest. Nevertheless, the Court has considered the parties' arguments on these factors, and finds that, on balance, the factors still weigh in favor of denying relief. The Court will therefore deny Plaintiffs' request for a temporary restraining order. Accordingly, the Court being otherwise sufficiently advised,

**IT IS HEREBY ORDERED** as follows:

1. Plaintiffs' request for a temporary restraining order, [**R. 2**], is **DENIED**.

2. On or before **Wednesday, July 8, 2026**, the parties **SHALL** meet and confer and file a Joint Status Report that advises as to whether Plaintiffs continue to seek a preliminary

injunction. If so, the Joint Status Report shall (1) advise whether the parties seek limited discovery on Plaintiffs' request for a preliminary injunction, and if so, provide a limited discovery plan; (2) provide a proposed briefing schedule on Plaintiffs' request for a preliminary injunction; and (3) provide agreed upon potential dates for a preliminary injunction hearing. Upon receipt of the Joint Status Report, the Court will enter a discovery plan, enter a briefing schedule, and set a hearing to address the request for a preliminary injunction, if necessary.

This the 29th day of June, 2026.

CLARIA HORN BOOM,
UNITED STATES DISTRICT COURT JUDGE
EASTERN AND WESTERN DISTRICTS OF
KENTUCKY